NOT RECOMMENDED FOR PUBLICATION
File Name: 14a0194n.06

FILED
Mar 12, 2014
DEBORAH S. HUNT, Clerk

## UNITED STATES COURTS OF APPEALS
## FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| FREDERICK L. CARTER, | ) | SOUTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

Before: DAUGHTREY, COOK, and WHITE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. Reserving the right to contest the district court's denial of his motion to suppress, defendant Frederick Carter entered a conditional guilty plea to conspiracy to possess heroin with the intent to distribute and to possession of a firearm in furtherance of a drug-trafficking offense, two counts of a multi-defendant indictment. Carter was charged as a participant in a massive drug-trafficking network in Columbus, Ohio, following an investigatory stop by local police officers and the seizure of a weapon and a quantity of heroin from Carter's person. He now appeals his conviction, challenging the constitutionality of the search and seizure based on his claim that the arresting officer lacked the requisite reasonable suspicion both to make the stop in the first place and to conduct a pat-down search for a weapon. We find no reversible error in connection with the district court's decision to deny Carter's motion to suppress, and we therefore affirm the conviction.

**FACTUAL AND PROCEDURAL BACKGROUND**

There is no dispute on appeal concerning the existence of the underlying conspiracy to distribute heroin that was at the heart of this case. It was being carried on by at least five individuals, including Carter's co-defendants – Brian Johnson, Arnett Smotherman, Sontay Smotherman, and Waymon Price – in the Mount Vernon area of Columbus, which was known as a high-crime area rife with significant narcotics activity. In late 2011, Detective John Whitacre received a tip from a confidential informant that someone named "Paco," later identified as Carter, had supplied heroin to a drug house in the area and was also conducting street-level sales. That same informant gave Whitacre a cell-phone number for "Paco," which the police used to trace Carter's movements and to find an address for him at 327 Monroe Street. The informant also identified the house that Carter allegedly supplied with heroin, a residence at 401 Taylor Avenue. Whitacre testified that this confidential informant had previously supplied "accurate, verified . . . information."

Based on the tip, the police began constant surveillance at the Taylor Avenue house and observed activity by members of the conspiracy that led to the issuance of a search warrant for the premises. Officers who executed the warrant found over 800 units of heroin. The police also tracked down Arnett Smotherman at a different house, located at 823 Rich Street, where they later observed various individuals involved in the drug network. When officers conducted a trash pull on the Rich Street house, they found evidence of drug-trafficking that was consistent with evidence found at the Taylor Avenue address.

Although Carter's cell phone records showed that he had visited the Taylor Avenue house at some point in the past, the police never observed him in or around either that house or

the one on Rich Street. However, Detective Whitacre twice followed Johnson from the Rich Street house to meetings with Carter. On the first occasion, both Johnson, arriving in a car, and Carter, traveling on foot, entered an apartment building on the corner of Mount Vernon and 18th Avenue, where they remained for "[t]en or fifteen seconds" before leaving the building and going off in different directions. Whitacre considered this behavior to be consistent with "some type of narcotics transaction." The second occasion occurred after Whitacre had followed Johnson from the Rich Street house before losing him in traffic. On a hunch, Whitacre drove to the corner of Mount Vernon and 18th Avenue, hoping to find Johnson there. There he again observed Johnson and Carter arrive separately, enter the apartment building for a short period of time, and then leave separately.

Based on this observation, Whitacre radioed Officer Brian Wildman, who was patrolling the area. Whitacre and Wildman had worked together for many years, including recent surveillance of the Taylor Avenue house. Whitacre testified that on dozens of occasions, he had asked Wildman to make a stop for him after Whitacre witnessed a suspected narcotics transaction. Wildman estimated that when Whitacre told him to stop someone after a suspected drug deal, Wildman found drugs on the suspect "85 to 90 percent of the time." On this occasion, Whitacre radioed Wildman and told him that he had "seen two individuals meet up. I told him what the person was wearing and where he was . . . . I told him that I wanted him to stop Paco."

Whitacre saw Wildman drive past Carter just as Carter began to cross the street against a red light. When Carter saw Wildman's patrol car approaching, he turned around, returned to the sidewalk, and waited for the light to turn green before crossing. Whitacre again radioed Wildman to tell him what Carter was wearing and that Wildman had just passed him. Wildman

then did a U-turn. When Whitacre came to a stop, his view of the proceedings was blocked by Wildman's cruiser, and he was later unable to verify Wildman's version of events.

However, Wildman testified that while he turned his car around, Carter watched the car with a "[n]ervous, concerned" demeanor. At first, Carter remained stationary on the sidewalk. Then, as Wildman began to get out of the patrol car, Carter "took, like, three baby steps backwards" before "turn[ing] and tak[ing] two [or three] quick steps" in the opposite direction. Wildman shouted: "Don't run! Don't run! I know you've got a gun!" As a matter of fact, as he later testified, Wildman had no specific reason to think that Carter had a gun. Instead, this tactic was one he used regularly to avoid having to chase a younger suspect who was likely to outrun him. Indeed, Wildman said, he had previously yelled "I know you have a gun" to "thirty or forty" suspects even when he had no reason to believe they were armed, because "if you accuse them of doing something that they know they're not doing, they won't run; they'll just stand there." Thus, he said, the usual reaction was for suspects to stop and let Wildman see that they were not armed. Carter, however, did not follow this pattern. Instead, he "laid down immediately . . . like [in] a football drill."

Wildman claims that this reaction – lying down as opposed to standing still – made him suspicious that Carter might actually have a gun. Carter moved his hands away from his body, apparently signaling, in Wildman's mind, that "he definitely didn't want to be a threat." Wildman then turned Carter over onto his left side and "reached around his belt line." In the front part of Carter's waist, Wildman felt the butt of a handgun. After securing the weapon, Wildman handcuffed Carter, stood him up, and searched him, ultimately finding 34 grams of

heroin. When Wildman asked him why he stopped running, Carter replied, "You knew I had the gun; I didn't want to get shot."

Following his arrest, Carter was indicted for possession with intent to distribute heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(C), and possession of a firearm in furtherance of drug-trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(i), and by a superseding indictment with an additional count of conspiracy to possess with intent to distribute more than 100 grams of heroin, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(B)(i), and 21 U.S.C. § 846. Carter then filed a motion to suppress the evidence seized by Wildman, claiming that Wildman lacked sufficient reasonable suspicion to justify an investigatory stop and that, assuming the stop was justified, his pat down search unlawfully expanded the scope of the stop.

At the suppression hearing, Wildman explained that there were three reasons for his pat-down search: first, Whitacre's communication that he had "observed a narcotics transaction," second, Carter's nervousness, and, third, Carter's attempt to flee. At the conclusion of the hearing, the district court denied Carter's motion, ruling that the circumstances resulted in a reasonable suspicion by Wildman that Carter was engaged in criminal activity. The court's conclusion was partially based on the following, uncontested facts: heroin was commonly sold in the area; the neighborhood was known as a high-crime area; a reliable confidential informant claimed Carter was selling drugs in the area; Johnson's visits to Carter connected Carter to the known drug houses on Taylor Avenue and Rich Street; Carter and Johnson's meetings "fit[ ] the profile of a drug transaction;" Carter turned away when he saw Wildman's cruiser approach; and Carter "appeared nervous and attempted to flee" when stopped by Wildman. Similarly, the district court found that a number of these factors justified Wildman's pat-down search and

subsequent seizure.  The district court also considered relevant the fact that people involved in drug activity are often armed.

Following the denial of his motion to suppress, Carter pleaded guilty to the conspiracy count and to possession of a firearm in furtherance of a drug-trafficking offense but reserved the right to appeal the district court's order denying suppression.  In conformity with the plea agreement and the recommendation in the presentence report, the district court imposed a sentence of 10 years, to be followed by five years of supervised release.

**DISCUSSION**

"Whether a search and seizure was reasonable under the Fourth Amendment is a question of law" that we review *de novo*.  *United States v. Blair*, 524 F.3d 740, 747 (6th Cir. 2008). Whether an officer had reasonable suspicion to stop a suspect "is ultimately a mixed question of law and fact (or, in other words, an application of law to fact)," and is also subject to *de novo* review.  *United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002).  The district court's findings of fact are reviewed for clear error.  *Blair*, 524 F.3d at 747.  "When the district court has denied a motion to suppress, we must consider the evidence in the light most favorable to the government."  *United States v. Johnson*, 620 F.3d 685, 690 (6th Cir. 2010) (citing *Blair*, 524 F.3d at 748).

Under the Supreme Court's decision in *Terry v. Ohio*, 392 U.S. 1 (1968), police "officers have the authority under the Fourth Amendment to stop and temporarily detain citizens with only reasonable suspicion to justify the stop."  *United States v. Patterson*, 340 F.3d 368, 370 (6th Cir. 2003).  The *Terry* opinion further authorized a pat-down search for weapons during such a

warrantless stop "[if] a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

The legitimacy of a *Terry* search and seizure is determined by "a two-part analysis of the reasonableness of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005). "'We first ask whether there was a proper basis for the stop' and, if the stop was proper, 'then we must determine whether the degree of intrusion . . . was reasonably related in scope to the situation at hand.'" *United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010) (quoting *United States v. Caruthers*, 458 F.3d 459, 464 (6th Cir. 2006)).

If an officer "has reasonable, articulable suspicion that a person has been, is, or is about to be engaged in criminal activity," the officer "can stop and briefly detain [that] person." *United States v. Williams*, 615 F.3d 657, 666 (6th Cir. 2010) (internal quotation marks and citations omitted). "That suspicion 'must be based on specific, objective facts,'" *Id.* (quoting *Brown v. Texas*, 443 U.S. 47, 51 (1979)), or "the specific reasonable inferences which [the officer] is entitled to draw from the facts in light of his experience." *Terry*, 392 U.S. at 27. "In evaluating whether an officer had reasonable suspicion, we must consider the totality of the circumstances rather than analyze each fact in isolation." *Williams*, 615 F.3d at 666. Although the totality-of-circumstances test means that facts "must be considered as a whole," a proper evaluation of the relevant facts requires that each be "examined in some orderly fashion." United States v. Smith, 263 F.3d 571, 591 (6th Cir. 2001).

In Carter's case, the district court first considered the confidential informant's communication about Carter (or, as the informant called him, "Paco"). When an informant is known to an officer and has previously provided information, the informant's tip generally

carries with it "enough indicia of reliability to justify" a *Terry* stop. *Adams v. Williams*, 407 U.S. 143, 147 (1972); *cf. Patterson*, 340 F.3d at 371 (holding that a tip without "basis for reliability" cannot support reasonable suspicion). Here, Whitacre testified that the informant had been previously reliable and was, in fact, able to provide the information leading to the surveillance of the Taylor Avenue house and, subsequently, the Rich Street house. Some of the details provided by the informant could not be corroborated, *i.e.*, his naming Carter as the supplier of Taylor Avenue drug house – a claim for which there was no independent evidence in the record. However, the informant also provided a fair amount of information later confirmed by the police, such as Carter's phone number and Carter's role as a street-level dealer. Under the totality-of-circumstances test, we conclude that the district court appropriately held that the information from a previously reliable informant was sufficient to establish that Wildman's stop of Carter was reasonable.

The district court also considered the fact that Carter was stopped in a high-crime area. Although "[a]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime," it is a "relevant characteristic[]" and may be considered "among the relevant contextual considerations in a *Terry* analysis." *Illinois v Wardlow*, 528 U.S. 119, 124 (2000) (citations omitted). In this circuit, we generally consider "the high-crime context" when "the specific criminal history of the [area]" corresponds with "the same crime for which the citizen was stopped." *United States v. Young*, 707 F.3d 598, 604 (6th Cir. 2012); *see also Caruthers*, 458 F.3d at 467-68. In this case, Carter was stopped in an area known for heroin-trafficking. Both officers testified to the neighborhood's reputation as a center of drug activity. Wildman thus stopped Carter for "the same crime" as the "specific criminal history" in the area, giving the

district court a reasonable basis on which to consider the high-crime nature of the neighborhood as a contextual factor.

In addition, the district court considered Carter's agitated response to Wildman's approach as relevant to Wildman's action. Generally, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." , 528 U.S. at 124. However, we must weigh "the speed of the suspect's movements" and the "abruptness and other evasive characteristics of a suspect's departure upon noticing the police" in determining reasonable suspicion. *Johnson*, 620 F.3d at 694 (quoting *Caruthers*, 458 F.3d at 466); *see also United States v. Henry*, 429 F.3d 603, 614 (6th Cir. 2005) (requiring "evasive behavior in conjunction with [a suspect's] nervousness" to justify reasonable suspicion).

Here, Carter clearly reacted to Wildman's approach. Both Whitacre and Wildman witnessed Carter change his course of direction in the middle of the street as soon as he spotted Whitman's patrol car. Wildman further testified that after he pulled up his car near Carter, Carter began slowly walking away and then increased his pace. The district court found that these reactions constituted an "attempt[] to flee." Carter argues that what amounted to a brisk walk should not be considered an attempt to flee, as we held in *United States v. Beauchamp*, 659 F.3d 560, 570-71 (6th Cir. 2011) (concluding that "hurriedly walking away from an officer without making eye contact" did not constitute evasive behavior). Carter's interpretation of the facts – a brisk walk versus an attempt at flight – seems equally plausible from the record. But Carter has not presented any evidence to show that the district court's interpretation was clearly erroneous. And, "'where there are two permissible views of the evidence,' the district court's conclusions 'cannot be clearly erroneous.'" *United States v. Worley*, 193 F.3d 380, 384 (6th Cir.

1999) (brackets omitted) (quoting *Anderson v City of Bessemer City*, 470 U.S. 564, 574 (1985)). Presuming, then, that Carter displayed evasive behavior sufficient to meet the standards of *Wardlow*, the district court was correct to include this behavior within the totality of circumstances contributing to Wildman's reasonable suspicion. *See Unites States v. Jeter*, 721 F.3d 746, 755 (6th Cir. 2013) ("There are innocent reasons to flee, but *Terry* permits 'officers to detain the individuals to resolve the ambiguity.'") (quoting *Wardlow*, 528 U.S. at 125) (alteration omitted).

Although none of these factors would, standing alone, justify a warrantless stop, collectively they establish an "articulable suspicion . . . based upon an assessment of *all* circumstances surrounding the actions of a suspected wrongdoer." *United States v. Knox*, 839 F.2d 285, 290 (6th Cir. 1988) (emphasis in original). We thus conclude that the district court did not err in holding that Wildman validly stopped Carter under *Terry*.

The validity of the stop does not resolve the question of whether the ensuing search of Carter's person was reasonable. "A lawful stop does not necessarily carry with it the authority to conduct a pat-down search." *Bennett v. City of Eastpointe*, 410 F.3d 810, 822 (6th Cir. 2005). To justify the search, the prosecution must show that "a reasonably prudent man" would believe that Carter's actions in the course of the stop "warranted . . . the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27; *see United States v. Graham*, 483 F.3d 431, 436 (6th Cir. 2007) ("The Supreme Court has *never* authorized a protective search on anything less that reasonable suspicion that a suspect was armed and dangerous.")

At the suppression hearing, Wildman testified that he did not believe Carter had a gun until Carter laid down on the ground with his arms spread away from his body. Once that

occurred, Wildman testified, he based his suspicion that Carter was armed on three factors: Whitacre's claim that Carter had recently conducted a drug deal; Carter's nervousness; and Carter's unusual response to Wildman yelling "I know you have a gun." The district court found three additional factors to justify the pat-down search: the neighborhood's character as a high-crime area; recognition that drug dealers often carry guns; and Carter's attempt to flee.

When Whitacre told Wildman that Carter and Johnson had just conducted a drug deal and requested that he stop Carter, Wildman was allowed to invoke the "fellow officer rule" and "conduct a stop based on information obtained" from Whitacre. *United States v. Lyons*, 687 F.3d 754, 765-66 (6th Cir. 2012). Although nothing said by Whitacre to Wildman directly suggested that Carter was armed or dangerous, the officers could reasonably rely on the well-known fact that drug-trafficking often involves the use of weapons, creating the necessary nexus between drug transactions and weapons searches. *See United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001) ("This Court has held many times that guns are 'tools of the trade' in drug transactions." (quoting *United States v. Arnott*, 704 F.2d 322, 326 (6th Cir. 1983))).

As for the testimony concerning Carter's nervousness as a justification for the pat-down search, we have held that more is required than "[n]ervous behavior, standing alone, . . . to justify a <u>Terry</u> search." *United States v. Wilson*, 506 F.3d 488, 495 (6th Cir. 2007). We have also recognized that a suspect's evasive behavior may justify a *Terry* stop without justifying a subsequent pat-down search. *See Bennett*, 410 F.3d at 822 (requiring "specific facts" to justify a pat-down search even after a valid stop). But additional nervous behavior arose in this case when Wildman yelled, "I know you have a gun," and Carter immediately sprawled face-down on the ground. As he told police and later testified, he was convinced that Wildman knew he had a

gun and was afraid that he would be shot if he continued his attempt to flee. The district court certainly did not err in concluding that this factor added to Wildman's reasonable suspicion that Carter was armed.

The district court also took into account two circumstantial facts relevant to Wildman's search of Carter — that the neighborhood was a high-crime environment and that drug dealers often carry guns. As noted above, the high-crime nature of the area is normally accorded only minimal weight. *See Young*, 707 F.3d at 603; *Caruthers*, 458 F.3d at 467-68. But Wildman did have good reason to believe that Carter was involved in drug-trafficking, and he also knew that drug dealers commonly carry weapons. These factors, taken together, carry more weight in the calculus than either would if standing alone.

The district court also considered Carter's attempt to reverse course when he first saw Wildman's police cruiser as a reason to search him for a weapon. Although Carter's reaction consisted of taking several quick steps backwards, rather than engaging in headlong flight, the court found that this action constituted an attempt to flee, a conclusion that is not clearly erroneous. This factor and the others considered by the court support the district court's conclusion that the officer was entitled to conduct a pat-down search for his own safety.

On appeal, Carter also argues that Wildman conducted his stop and frisk in an unreasonable manner. However, as the government points out, this argument was not presented in the district court and, therefore, cannot be reviewed on appeal. *See United States v. Bonds*, 12 F.3d 540, 569 (6th Cir. 1993).

**CONCLUSION**

For the reasons set out above, we conclude that the district court did not err in denying

the defendant's motion to suppress, and we AFFIRM the district court's judgment of conviction.