NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0290n.06

No. 21-6123

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

FILED
Jul 19, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR |
| v. | ) | THE MIDDLE DISTRICT OF |
| | ) | TENNESSEE |
| JOEY FAUGHT, | ) | |
| | ) | |
| Defendant-Appellant. | ) | OPINION |
| | ) | |

Before: GIBBONS, ROGERS, and MURPHY, Circuit Judges.

MURPHY, Circuit Judge. While monitoring a public housing authority's surveillance cameras, a police officer observed what looked like a drug deal. He alerted on-the-scene officers, who stopped and frisked one of the suspects—Joey Faught. Faught, a felon, was illegally carrying a handgun. A state court revoked his probation and ordered his imprisonment for an earlier crime. A federal grand jury subsequently indicted Faught for possessing a firearm as a felon in violation of federal law. Many months went by before federal officials took Faught into custody from state officials. He ultimately entered a conditional guilty plea in this federal case.

Faught now argues that the stop and frisk violated the Fourth Amendment. He also argues that the delay in prosecuting his federal case violated the Interstate Agreement on Detainers. And he argues that the district court's sentence placed too much weight on an enhancement for large-capacity magazines. Yet the officers had reasonable suspicion that Faught engaged in a drug

transaction under the totality of the circumstances, and this suspicion allowed them to pat him down for the firearm that they found. Faught also failed to properly invoke one of the speedy-trial protections of the Interstate Agreement on Detainers, and he waived the other protection by seeking continuances of his trial. Lastly, the district court reasonably applied the large-capacity-magazine enhancement. We thus affirm Faught's conviction and sentence.

I

For over a decade, Sergeant Matthew Boguskie has served in various roles with the police department in Nashville, Tennessee. During much of this time, he has investigated drug crimes. He spent two years with the crime-suppression unit coordinating controlled drug buys and conducting undercover buys. He spent another two years with the gang unit, which also facilitated many controlled buys. He has participated in about 500 of these sorts of transactions.

In January 2018, Boguskie was supervising a "flex team" that patrols different high-crime areas in Nashville depending on the prior week's crime statistics. On the evening of January 9, the flex team was located in a block of public row homes in east Nashville. Nashville's public housing authority had set up a video surveillance system to monitor the outside areas of this neighborhood. Boguskie was watching these surveillance cameras from his office seven miles away. On several prior occasions, the same type of video surveillance had led to the discovery of criminal activity in the area.

This evening, Boguskie observed what he thought were two people engaging in a drug deal. The pair met for a brief period in a courtyard and walked to the side of a building away from normal pedestrian traffic. They engaged in "some sort of hand transaction" in this more secluded location. Tr., R.67, PageID 293. Boguskie could see their hands and knew that they had not engaged in a handshake, but he did not see anything change possession and could not rule out a

2

different type of greeting (such as a fist bump). After the hand movement, the individuals quickly went their separate ways. One left on a bike; the other left on foot.

Boguskie decided to track the person who walked away from the transaction because of the difficulty of following a bicyclist over the video. Except for a brief moment when the suspect entered a "blind spot," Boguskie successfully followed him on the video as he traveled through the neighborhood. Boguskie radioed two members of the flex team, including Officer Michael Wolterbeek, that he had just seen a suspected drug deal. He guided these two officers to the suspect over the radio.

Wolterbeek soon obtained a visual. Yet a third patrolling officer who was not part of the flex team happened to be in the area closer to the suspect. One of the flex-team members radioed this other officer to stop him. The officer did so. While approaching the stop, Wolterbeek believed that the suspect was "blading away" from this other officer. *Id.*, PageID 351. By "blading," Wolterbeek meant that the suspect was not standing face-to-face with the officer and had his body turned to the side at an angle of some 10 to 15 degrees.

Wolterbeek decided to frisk the suspect. In his experience, parties to a drug transaction may not know each other well and thus sometimes bring firearms for their protection. The suspect's "blading" also raised Wolterbeek's concerns because individuals sometimes take this angled position when they are trying to conceal a gun or to keep it at a distance from the person they are talking to. As Wolterbeek noted, "[o]fficers do it all the time" when they speak to the public. *Id.*, PageID 354. Wolterbeek also believed that Faught was "very agitated" with the other officer. *Id.*, PageID 356.

During the frisk, the suspect "pulled away several times" as Wolterbeek sought to search his front waist area. *Id.*, PageID 352. Wolterbeek eventually felt a handgun in this area, and the

3

suspect confirmed that he had a gun. The officers subsequently learned the suspect's identity: Joey Faught. When they discovered that Faught was a felon who could not lawfully possess firearms, they arrested him.

As it turns out, Faught had been using his cellphone to record himself walking through the area before the confrontation. Two minutes into this video, the officer who stopped Faught addressed him from offscreen, and Faught agreed to speak with this officer. The officer told Faught that someone had seen him "exchange hands" with another person. Faught denied the claim. Wolterbeek, who had reached Faught by this point, responded that they had him on video. Over Faught's objection, Wolterbeek indicated that they were going to frisk him. During the encounter, Faught expressed exasperation with the officers but largely complied with their requests.

At the time of this January 2018 offense, Faught had been on probation for a felon-in-possession conviction under Tennessee law. By the end of the month, a state court revoked his probation and committed him to state custody to serve the sentence for this earlier conviction. Subsequently, on August 1, 2018, a federal grand jury indicted Faught for possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Days later, U.S. Marshals delivered a document entitled "detainer" to the state officials who held Faught asking them to notify the Marshals upon Faught's release. In November, a federal magistrate judge also issued a writ of habeas corpus ad prosequendum ordering the Marshals to transfer Faught to federal custody for his federal prosecution.

Faught, however, remained in state custody for several more months. In February 2019, he wrote a letter to the clerk of the federal district court about his federal case. He explained that he was without counsel, that he sought "to obtain a copy of the writ," and that he was "trying to

have the U.S. Marshal transport [him] to a federal facility so that [he] can begin serving [his] federal time." Ltr., R.6, PageID 10. Faught asked the clerk "what paperwork [he] must file to exp[e]dite [his] transportation[.]" *Id.*

The Marshals finally executed the writ on July 30, and the district court set Faught's trial date as October 8. Yet the delays in Faught's case did not end. Faught himself moved to continue his trial five times. The district court granted each request.

During these delays, Faught moved to suppress his firearm on the ground that the officers had violated the Fourth Amendment when they recovered it from him. He also moved to dismiss the indictment on the ground that the government had violated its speedy-trial duties under the Interstate Agreement on Detainers. The court denied both motions. *See United States v. Faught*, 2021 WL 848700, at *5 (M.D. Tenn. Mar. 5, 2021); *United States v. Faught*, 2021 WL 288756, at *6 (M.D. Tenn. Jan. 27, 2021).

Faught entered a conditional guilty plea that preserved his right to appeal the court's decisions. At sentencing, the court calculated Faught's guidelines range as between 63 and 78 months' imprisonment. This range rested in part on an enhancement that applied because Faught's gun had a large-capacity magazine. *See* U.S.S.G. § 2K2.1(a)(3). Faught argued that the court should give little weight to this large-capacity-magazine enhancement because the guideline defined "large capacity" (15 rounds or more) arbitrarily and without empirical support. *See id.* § 2K2.1 cmt. n.2. The district court disagreed. It imposed a 63-month sentence.

II

Faught raises three claims on appeal. He argues that the officers violated the Fourth Amendment by stopping and searching him. He argues that the prosecution violated the Interstate

5

Agreement on Detainers by failing to meet its trial deadlines. And he argues that the district court imposed an unreasonable sentence by relying on the large-capacity-magazine enhancement.

## A. Fourth Amendment

Faught first asserts that the district court should have suppressed his firearm because the officers' stop and search of him ran afoul of the Fourth Amendment's ban on "unreasonable searches and seizures[.]" U.S. Const. amend. IV. In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court interpreted this language to allow officers to "stop and frisk" a suspect if they have reasonable suspicion that the suspect is engaged in a crime and a danger to the officers. *See Arizona v. Johnson*, 555 U.S. 323, 326–27 (2009). Faught challenges the district court's holding that the officers in his case had the required reasonable suspicion. We review the court's factual findings about what happened during the encounter for clear error and its holding that reasonable suspicion existed de novo. *See United States v. Paulette*, 457 F.3d 601, 605 (6th Cir. 2006).

The reasonable-suspicion test does not demand much. *See United States v. McCallister*, __ F.4th __, 2022 WL 2525217, at *3 (6th Cir. July 7, 2022). To put things in perspective, the probable-cause standard necessary for a more invasive search or seizure "is not a high bar," requiring only a "probability or substantial chance of criminal activity[.]" *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)). And the reasonable-suspicion test requires less than this modest bar. *See United States v. Sokolow*, 490 U.S. 1, 7 (1989). An officer needs only a suspicion that is "particularized" (tailored to a specific person) and "objective" (based on more than a hunch) under the totality of the circumstances known to the officer. *Kansas v. Glover*, 140 S. Ct. 1183, 1187 (2020).

This reasonable-suspicion test asks different questions depending on whether the officer seeks to stop a person or to frisk the person. A temporary detention requires a reasonable suspicion

that a suspect has committed or is about to commit a crime. *See Sheckles*, 996 F.3d at 343. A pat-down search requires a reasonable suspicion that the suspect is a danger to the officer because, for example, the suspect has a gun. *See Johnson*, 555 U.S. at 332.

Faught argues that the officers lacked reasonable suspicion both to stop him and to frisk him. We disagree on both fronts, beginning with the stop. We have repeatedly held that an officer's observation of a hand-to-hand transaction that looks like a drug deal can help establish the reasonable suspicion required for a stop to investigate the parties. *See Paulette*, 457 F.3d at 606; *see also, e.g.*, *Williams v. United States*, 632 F. App'x 816, 822–23 (6th Cir. 2015); *United States v. Alexander*, 528 F. App'x 515, 519 (6th Cir. 2013); *United States v. Jones*, 673 F.3d 497, 502–03 (6th Cir. 2012); *United States v. Johnson*, 627 F.3d 578, 583–84 (6th Cir. 2010); *United States v. Sweeney*, 402 F. App'x 37, 41–42 (6th Cir. 2010). Perhaps equally noteworthy, our cases finding a lack of reasonable suspicion in similar circumstances have emphasized that the officers did *not* see this sort of exchange. *See United States v. Beauchamp*, 659 F.3d 560, 570 (6th Cir. 2011); *United States v. Johnson*, 620 F.3d 685, 693 (6th Cir. 2010).

This precedent shows that the officers had reasonable suspicion to stop Faught under the totality of the circumstances. To begin with, as in many of our similar cases, Sergeant Boguskie and his flex unit were surveilling a high-crime area of Nashville. *See Jones*, 673 F.3d at 502; *Paulette*, 457 F.3d at 606; *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). In addition, Boguskie had significant experience watching how drug dealers exchange drugs, having been involved in some 500 controlled or undercover buys. *Cf. Johnson*, 627 F.3d at 583–84; *Sweeney*, 402 F. App'x at 40–41. And Boguskie believed that he had seen Faught engage in such a transaction while monitoring the surveillance video. It was not just the "hand transaction" that led him to this conclusion. Tr., R.67, PageID 293. It was also the fact that Faught had met with another person

in an open courtyard but waited to engage in this transaction in a secluded area by the side of a building. The pair then quickly went their separate ways, and their interaction lasted a short time. Taken together, these facts sufficed to establish a reasonable suspicion for an investigatory stop.

Turning to the frisk, the reasonable suspicion that Faught had participated in a drug deal helps create a reasonable suspicion that he was armed. Firearms and drugs often go together. *See United States v. Hardin*, 248 F.3d 489, 499 (6th Cir. 2001). The illicit drug trade is a dangerous business, so those engaged in it commonly possess firearms to protect themselves, their drugs, or their proceeds. *See United States v. Maya*, 966 F.3d 493, 502–03 (6th Cir. 2020). We thus have repeatedly held that officers may frisk a suspect for a weapon when they reasonably believe that the suspect possesses illegal drugs or has engaged in an illegal drug transaction. *See Nykoriak v. Wileczek*, 666 F. App'x 441, 444 (6th Cir. 2016) (per curiam); *United States v. Jackson*, 663 F. App'x 426, 429 (6th Cir. 2016); *United States v. Carter*, 558 F. App'x 606, 612 (6th Cir. 2014); *United States v. Young*, 277 F. App'x 587, 589–90 (6th Cir. 2008); *United States v. Garcia*, 496 F.3d 495, 505 (6th Cir. 2007); *United States v. Akinyemi*, 101 F. App'x 109, 111 (6th Cir. 2004) (order). This case should be no different.

In fact, Officer Wolterbeek had even more information to go on. We have recognized that if a suspect stands in a "bladed" position by turning away from an officer as if to conceal something, that positioning can add to the reasonable suspicion that the suspect might have a weapon. *See United States v. Moberly*, 861 F. App'x 27, 31 (6th Cir. 2021); *United States v. Lewis*, 843 F. App'x 683, 691 (6th Cir. 2021); *United States v. Johnson*, 428 F. App'x 616, 618, 621 (6th Cir. 2011). And here, when Wolterbeek approached the location of Faught's stop, he perceived Faught taking such a position as he faced the officer who had stopped him.

Faught's responses do not change our analysis. He points to Boguskie's concession that the hand-to-hand transaction could have been an innocent fist-bump by two friends saying goodbye. True enough. But the reasonable-suspicion test is not so demanding as to require officers to "rule out the possibility of innocent conduct" before a stop. *United States v. Arvizu*, 534 U.S. 266, 277 (2002). Indeed, the entire point of a *Terry* stop is to rule out innocent conduct by investigating whether a suspect has an explanation for what looks like a potential crime. So Kansas officers could stop a car whose owner had a revoked driver's license because the owner might have been illegally driving the car—even though a relative with a valid license could have been the one innocently behind the wheel. *See Glover*, 140 S. Ct. at 1188. And Ohio officers could stop individuals who appeared to be casing a store in preparation for a robbery—even though the individuals might have been innocently fretting over whether to spend hard-earned money on merchandise in the store window. *See Terry*, 392 U.S. at 6, 21–23.

Faught next challenges the district court's finding that he had been "blading" away from the officer who stopped him, arguing that his cellphone video contradicted Wolterbeek's testimony about his stance. As the district court explained, however, the video does not provide a clear picture of the parties' positioning. *Faught*, 2021 WL 848700, at *5. It thus does not allow us to disregard the court's decision to credit Wolterbeek under the deferential clear-error standard that applies to this factual finding. *See Paulette*, 457 F.3d at 605.

### B. Interstate Agreement on Detainers

Faught next argues that the district court should have dismissed his indictment because the government failed to prosecute him in accordance with the Interstate Agreement on Detainers. This Agreement seeks to combat a longstanding problem. Sometimes one sovereign (for example, the United States) charges a defendant with a crime, but the defendant resides in the prison of a

different sovereign (for example, Tennessee) for a different crime. The prosecuting sovereign has historically filed a "detainer" with the custodial jurisdiction to alert it of the pending charges. *See United States v. Mauro*, 436 U.S. 340, 358–59 (1978). These detainers created difficulties for prison administrators and prisoners alike. Administrators were reluctant to transfer prisoners before the end of their terms out of fear that the prisoners would not serve the remainder of the sentence. *See* Note, *The Detainer: A Problem in Interstate Criminal Administration*, 48 Colum. L. Rev. 1190, 1193–94 (1948). Detainers thus often sat on file for the duration of a sentence. Even when invalid, though, the detainers had real-world effects on prisoners by restricting their ability to participate in many prison programs. *See Carchman v. Nash*, 473 U.S. 716, 719–20, 730 & n.8 (1985).

These difficulties led many states to recognize the need for greater cooperation and speedier resolution of detainers. *See* 18 U.S.C. app. 2, § 2, art. I. In the 1950s, multi-state entities responded with a draft of what became the Agreement. *See Mauro*, 436 U.S. at 350–51. Over time, more and more states came to adopt this Agreement. (As a state compact, the Agreement required congressional approval, which had been provided by 4 U.S.C. § 112(a). *See* U.S. Const. art. I, § 10, cl. 3; *Cuyler v. Adams*, 449 U.S. 433, 440–42 (1981).) Congress, too, eventually adopted the Agreement in 1970. *See* Interstate Agreement on Detainers Act, Pub. L. No. 91-538, 84 Stat. 1397 (1970) (codified as amended at 18 U.S.C. app. 2, § 2). The Agreement now covers 48 states (including Tennessee), the United States, and the District of Columbia. *See* Tenn. Code Ann. § 40-31-101; *see also* 1 Barbara E. Bergman, et al., *Wharton's Criminal Procedure* § 6:14 & n.2 (14th ed.), Westlaw (database updated Nov. 2021) (listing jurisdictions).

The Agreement's provisions apply once a "Receiving State" (the state that seeks to prosecute a prisoner) lodges a "detainer" with a "Sending State" (the state that holds the prisoner).

10

*See* 18 U.S.C. app. 2, § 2, art. II(b)–(c), art. III(a), art. IV(a). At this point, either the prisoner (through Article III) or the prosecutor (through Article IV) may initiate the process of transferring the prisoner to face the charges pending in the Receiving State. *See id.*, art. III(a), art. IV(a); *New York v. Hill*, 528 U.S. 110, 112 (2000). Articles III and IV then provide distinct time limits that the Receiving State must meet for holding the prisoner's trial.

Faught argues that the district court should have dismissed the indictment because the United States violated the time limits in both articles. We have yet to conclusively identify the standard of review for these claims. *Cf. United States v. White*, 185 F. App'x 504, 507 (6th Cir. 2006). We need not do so here because Faught's claims fail even under de novo review. He did not properly invoke Article III's time limits, and he waived any reliance on Article IV's limits.

*Article III*. Once a Receiving State's prosecuting official lodges a detainer, Article III gives prisoners the right to request speedy disposition of the charges. It requires the Sending State to notify a prisoner of the detainer and of the prisoner's right to request a speedy disposition. 18 U.S.C. app. 2, § 2, art. III(c). And it requires the Receiving State to hold a trial within 180 days from the time that a prisoner has "caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the" charges. *Id.*, art. III(a). Prosecutors may seek continuances of this limit only in certain circumstances. *Id.* If they fail to hold a trial within the required period, a court must dismiss the charges. *See id.*, art. V(c).

According to Faught, he started Article III's 180-day clock by sending a letter to the federal district court's clerk on February 26, 2019. *See* Ltr., R.6, PageID 10. The court docketed this letter (presumably alerting the prosecutor of it through the electronic filing system) on March 1. *See id.* But the court scheduled Faught's trial originally for October 8, well over 200 days later.

11

If this letter triggered Article III's 180-day limit, then, Faught correctly notes that the government violated its speedy-trial obligations. Yet Article III's text and the precedent interpreting it both show that Faught's letter fell short.

Article III details what must occur for its 180-day trial clock to begin to run. It requires the prisoner to provide "written notice" to both the "prosecuting officer" and the "appropriate court" in the officer's jurisdiction. 18 U.S.C. app. 2, § 2, art. III(a). This notice must identify two things—a prisoner's "place" of "imprisonment" and the prisoner's "request for a final disposition" of the charges. *Id.* A prisoner must give this "written notice" to the official in the Sending State that has custody of the prisoner. *Id.*, art. III(c). This official must pass along the request to the Receiving State's prosecuting authorities and its court. *Id.* The official also must include a "certificate" with the prisoner's request that provides several pieces of information, including the prisoner's term of imprisonment and remaining time to be served. *Id.*, art. III(a).

Courts have generally interpreted these requirements as written. *See Norton v. Parke*, 892 F.2d 476, 480–81 (6th Cir. 1989). Prisoners have often argued that a noncompliant "notice" triggered Article III's 180-day clock and required the dismissal of charges. Rejecting these claims, courts have refused to turn Article III into "a trap for unwary prosecuting officials" who fail to recognize that "ambiguous letters" seek to invoke Article III's protections. *Casper v. Ryan*, 822 F.2d 1283, 1293 (3d Cir. 1987) (citation omitted); *see also, e.g.*, *United States v. Martinez*, 59 F. App'x 638, 643–44 (6th Cir. 2003); *United States v. Dent*, 149 F.3d 180, 186–87 (3d Cir. 1998); *Lara v. Johnson*, 141 F.3d 239, 240–41, 243 (5th Cir. 1998); *United States v. Henson*, 945 F.2d 430, 435–36 (1st Cir. 1991). These courts have noted, among other things, that it is not difficult for prisoners to comply with Article III's formal requirements because most jurisdictions

have standardized forms to help them. *See Norton*, 892 F.2d at 480–81; *Casper*, 822 F.2d at 1292–93.

Two examples illustrate this approach. In one case, a prisoner sent a letter directly to the Receiving State's prosecutor indicating that he "wish[ed] to dispose of these and any and all other charges, if any, as fast and easily as possible" and that the prosecutor should consider the letter his "formal request for a fast and speedy trial in these matters." *Casper*, 822 F.2d at 1292. The court held that this letter did not suffice to start the 180-day clock because it did not follow Article III's mandate to first give the notice to the state official with custody of the prisoner. *See id.* at 1293–94. The letter thus did not include the information that Article III required that official to put in the "certificate" sent to the Receiving State. *See id.* at 1293–94; *cf. McCallum v. State*, 407 So. 2d 865, 869 (Ala. Crim. App. 1981). In another case from our court, a prisoner claimed that he had invoked his Article III rights by sending a letter to the court that asked for help in getting an attorney, obtaining a copy of the charges, and receiving his mail. *See Martinez*, 59 F. App'x at 643. We rejected his claim, noting that nothing in this letter mentioned the Agreement or even requested a trial on the charges. *See id.* at 644; *see also White*, 185 F. App'x at 509.

Under this text and precedent, Faught's letter did not trigger the 180-day time limit. After identifying the prison at which he was located and its address, Faught's letter stated in full:

> The purpose of writing this letter is to obtain a copy of the writ of habeas corpus that was filed on my behalf. Unfortunately, I don't have assistance of counsel and I am trying to have the U.S. Marshal transport me to a federal facility so that I can begin serving my federal time.
>
> I would like to know what paperwork I must file to exp[e]dite my transportation, as well as how I can amend my writ of habeas corpus because it has the wrong address for where I'm currently being held. Thank you!

Ltr., R.6, PageID 10.

Far from "strictly comply[ing]" with Article III, this letter failed to meet its most basic requirements. *Norton*, 892 F.2d at 480. Faught did not give the notice to the Tennessee official with custody of him. *See* 18 U.S.C. app. 2, § 2, art. III(a). Rather, he sent it directly to the clerk of the district court. So it did not include the "certificate" from this official with information on Faught's term of imprisonment and the amount of time he had left to serve. *See Casper*, 822 F.2d at 1293–94. Nor did Faught include this information in the letter. *See McCallum*, 407 So. 2d at 869. Perhaps most problematically, nothing in this letter contained a "request for a final disposition" of his case. 18 U.S.C. app. 2, § 2, art. III(a); *see Martinez*, 59 F. App'x at 643. The letter did not even request a trial. It instead asked for expedited "transportation" so that Faught could begin serving his "federal time." Ltr., R.6, PageID 10. If we held that this letter sufficed, we would be creating the very "trap" for the unsuspecting prosecutor that courts have sought to avoid. *See Casper*, 822 F.2d at 1293 (citation omitted).

Faught responds that he should not have to use "magic words" to invoke his Article III rights. Perhaps not. But no reasonable person would read this letter as the "request for a final disposition" that Article III requires. 18 U.S.C. app. 2, § 2, art. III(a). Indeed, even when a prisoner expressly requested a speedy trial, courts have held that the letter did not suffice to trigger Article III's protections because it failed to include other required information. *See Casper*, 822 F.2d at 1293–94. If that kind of letter does not suffice, Faught's letter cannot either.

Faught also suggests that the Tennessee prison authorities wrongly failed to inform him of his Article III rights—as the Agreement required them to do. *See* 18 U.S.C. app. 2, § 2, art. III(c). That is regrettable if true. And perhaps if those authorities made it impossible for him to comply with the Agreement's requirements—by, for example, refusing to deliver his written notice to the Receiving State—a court could excuse his failure to satisfy the article's formal requirements.

*See White*, 185 F. App'x at 507–08 (quoting *Norton*, 892 F.2d at 481). But, as far as we are aware, no court has held that the failure to inform a prisoner of the Agreement excuses the prisoner's failure to comply with the most basic of Article III requirements. As another court has noted in similar circumstances, "it would be distasteful for [the United States] to have to pay for [Tennessee's] mistakes[.]" *Lara*, 141 F.3d at 243. Because Faught never requested a final disposition of his case, he never triggered Article III's 180-day clock.

*Article IV*. Once a Receiving State's prosecuting official lodges a detainer, this official may request that the Sending State transfer the prisoner to the Receiving State's custody for trial. 18 U.S.C. app. 2, § 2, art. IV(a). Article IV sets forth a different time limit under this scenario: "trial shall be commenced within one hundred and twenty days of the arrival of the prisoner in the receiving State[.]" *Id.*, art. IV(c). Faught argues that the government failed to hold his trial within 120 days of his arrival in federal custody on July 30, 2019.

At the outset, this claim runs into a basic problem: Faught's original trial date (October 8) fit comfortably within the 120-day window. And *Faught*—not the *government*—pushed his trial back beyond this date. Starting well before October 8, he repeatedly moved for (and the district court repeatedly granted) continuances of the trial. Each time, Faught signed a waiver of his rights to a speedy trial under the Speedy Trial Act, 18 U.S.C. §§ 3161–74.

Even if the Speedy Trial Act permitted these continuances, Faught responds, they still conflicted with Article IV's procedures. Article IV permits a court to grant a continuance "for good cause shown in open court, the prisoner or his counsel being present[.]" 18 U.S.C. app. 2, § 2, art. IV(c). Faught does not dispute that Article IV's "good cause" language comports with the standard for a continuance that the district court found met under the Speedy Trial Act. *Cf. United States v. Peterson*, 945 F.3d 144, 154 (4th Cir. 2019). But he notes that the court granted some of

the continuances on the papers—not "in open court" in the presence of Faught or his counsel. 18 U.S.C. app. 2, § 2, art. IV(c). So these continuances violated the process that Article IV mandates. *See id.* This fact, Faught claims, rendered his continuances insufficient to toll the 120-day clock.

Precedent from both the Supreme Court and our court rebuts this claim. *See Hill*, 528 U.S. at 114; *United States v. Eaddy*, 595 F.2d 341, 344 (6th Cir. 1979). As a general rule, a criminal defendant may waive almost any right, including a constitutional right. *See Hill*, 528 U.S. at 114; *see also, e.g.*, *Peretz v. United States*, 501 U.S. 923, 936 (1991). At the same time, the nature of the right determines the method by which the defendant must waive it. *See Hill*, 528 U.S. at 114. To show the waiver of a bedrock constitutional right, for example, the government must prove that a defendant personally, knowingly, and voluntarily waived the right. *See Maryland v. Shatzer*, 559 U.S. 98, 104 (2010) (citing *Johnson v. Zerbst*, 304 U.S. 458 (1938)). To show a waiver of a more mundane matter (such as the right to object to the admission of evidence), a defendant may waive the protection by engaging in conduct that conflicts with the right. *See Hill*, 528 U.S. at 115. And a defendant's counsel (an agent) may waive the right on the defendant's behalf. *See id.*

*Hill* makes clear that the latter set of waiver rules applies to the Agreement's time limits. In that case, defense counsel told the trial court that it would "be fine" to delay the trial to a set date. *Id.* at 113. Yet the defendant had previously invoked his Article III rights, and, as it turns out, this date fell outside Article III's 180-day window. *Id.* The defendant later argued that the court must dismiss the indictment despite his counsel's agreement to the trial date because the government violated Article III. *Id.* The Supreme Court disagreed. *Id.* at 114–18. It reasoned that "[s]cheduling matters are plainly among those for which agreement by counsel generally controls." *Id.* at 115. And it rejected the view that the Agreement's explicit standards for granting

16

continuances (showing good cause in open court) barred the parties from agreeing to them in other ways. *Id.* at 115–16. Rather, those standards applied (and permitted continuances) in situations when the defendant *objected* to them. *Id.* at 116. The Court lastly highlighted the inequity that would arise if it allowed a defendant to agree to a trial on a particular date, let the relevant time limit expire, and assert that the trial date violated the Agreement only after the fact. *Id.* at 118.

We have likewise held that defendants may waive their rights under the Agreement by taking actions inconsistent with those rights. *Eaddy*, 595 F.2d at 344. In *Eaddy*, the Receiving State violated a provision of the Agreement that prohibited it from returning the prisoner to the Sending State before the trial. *Id.* at 343; *see* 18 U.S.C. app. 2, § 2, art. IV(e). We held that the prisoner had not waived this right merely by failing to expressly identify a preference as to his place of incarceration before trial. *Eaddy*, 595 F.2d at 343–45. In the process, though, we made clear that a prisoner could waive this right by making an "affirmative request" for a transfer to the Sending State's prison. *Id.* at 344; *cf. United States v. Baker*, 562 F. App'x 447, 453 (6th Cir. 2014) (Speedy Trial Act); *United States v. Howard*, 218 F.3d 556, 562 (6th Cir 2000) (same).

These cases doom Faught's claim here. He voluntarily sought the five continuances for several reasons—whether to review discovery materials, to determine whether to file a motion to suppress, to allow for more preparation time in light of COVID-19 restrictions, or to draft briefs. Each continuance motion was an "affirmative request" for a trial schedule that was "contrary" to the schedule mandated by Article IV. *Eaddy*, 595 F.2d at 344. Each motion thus constituted a waiver of Faught's rights under that article. *See Hill*, 528 U.S. at 115–16; *see also United States v. Fischer*, 193 F. App'x 790, 792 (10th Cir. 2006).

In response, Faught relies on *United States v. Crozier*, 259 F.3d 503 (6th Cir. 2001). In that case, the prisoner requested a continuance that extended the trial date beyond Article IV's

120-day window. *Id.* at 513. We held that the mere fact that the prisoner had requested a continuance did not show an "intentional abandonment" of his Article IV rights, and we thus reviewed his Article IV claim for plain error (because he did not raise the claim in the district court). *Id.* at 516. Yet the prisoner in *Crozier* had requested an open-ended continuance of "indeterminate length" without good cause, *id.* at 514, and so he had effectively sought a "prospective waiver of all protection of the [Agreement's] time limits," *Hill*, 528 U.S. at 115. Courts have been cautious before finding that a legal scheme permits that type of broad waiver. *See Zedner v. United States*, 547 U.S. 489, 500–03 (2006) (Speedy Trial Act); *see also Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 236 (2013). But no such open-ended waiver occurred in Faught's case. Rather, he repeatedly agreed to continuances of precise lengths for good cause.

Faught also argues that his continuance requests should not toll Article IV's time limits because he was unaware of his Article IV rights. As we noted in *Eaddy*, however, a prisoner may waive these sorts of scheduling rights "even though the prisoner is not aware" of them. 595 F.2d at 344. Faught, moreover, recognized that he had a general right to a speedy trial, which is why he personally signed a waiver of this right when requesting each continuance. We would create a significant "potential for abuse" if we allowed Faught to request a continuance of trial and to later characterize the granting of the continuance as a legal error. *Hill*, 528 U.S. at 118. We decline his invitation.

## C. Enhancement for Large-Capacity Magazines

Faught ends with both procedural and substantive challenges to his 63-month sentence. A defendant who raises a procedural challenge argues that the district court committed some type of process error (for example, by miscalculating the guidelines range) on the way to choosing the ultimate term of imprisonment. *United States v. Rayyan*, 885 F.3d 436, 440 (6th Cir. 2018).

A defendant who raises a substantive challenge, by contrast, attacks the "bottom-line" term of imprisonment as excessive when evaluated against the sentencing factors in 18 U.S.C. § 3553(a). *United States v. Lynde*, 926 F.3d 275, 279 (6th Cir. 2019).

Faught's sentencing arguments stem from the guideline for firearm offenses. This guideline increases a defendant's base offense level if the "offense involved" a "semiautomatic firearm that is capable of accepting a large capacity magazine[.]" U.S.S.G. § 2K2.1(a)(1), (3), (4). The commentary defines this phrase to include a semiautomatic firearm that, at the time of the offense, "had attached to it a magazine or similar device that could accept more than 15 rounds of ammunition[.]" *Id.* § 2K2.1 cmt. n.2. Faught did not dispute in the district court that his firearm included this type of magazine or that the enhancement should apply. He instead argued that the court should reject the enhancement because the commentary arbitrarily picked 15 rounds (rather than, say, 14 or 16) as the number that makes a magazine a "large-capacity" magazine. This general contention undergirds both of Faught's procedural and substantive arguments.

Procedurally, Faught says that the district court rejected his claim in a conclusory fashion on the ground that it was bound to follow the large-capacity-magazine enhancement. Faught is correct that the court would have committed a procedural error if it treated the enhancement as mandatory, *compare United States v. Pizzino*, 419 F. App'x 579, 582–83 (6th Cir. 2011), *with United States v. Barnett*, 398 F.3d 516, 525 (6th Cir. 2005), or if it failed to adequately explain its rationale for rejecting his argument, *compare United States v. Brinda*, 851 F. App'x 565, 568–69 (6th Cir. 2021), *with United States v. Gapinski*, 561 F.3d 467, 474–75 (6th Cir. 2009). But the court did neither. It recognized that it could vary from the guidelines when describing Faught's reasons why it should do so. Sent. Tr., R.95, PageID 591–92; *cf. United States v. Estrada*, 313 F. App'x 799, 809–10 (6th Cir. 2008). And it rejected his requested variance not because it

felt bound by the guidelines but because the variance "would result in a sentence that's insufficient under [the] Section 3553(a) factors." Sent. Tr., R.95, PageID 594. The court likewise gave no hint that it found the large-capacity-magazine enhancement binding. It held only that Faught failed to provide a convincing rationale for it to ignore this enhancement.

The court also provided "reasoned" grounds for its decision to follow the enhancement. *See United States v. Sabit*, 797 F. App'x 218, 222 (6th Cir. 2019) (quoting *Rita v. United States*, 551 U.S. 338, 356 (2007)). It recognized that the enhancement exists because a person using a large-capacity magazine needs to spend less time reloading and so can inflict greater harm in shorter time. While Faught argued that there was no "empirical evidence" to show that a 15-round magazine was more dangerous than a 14-round magazine, Sent. Tr., R.95, PageID 586, the court pointed out that the record contained no empirical evidence at all on the question, *id.*, PageID 600. It thus reasonably deferred to the Sentencing Commission, which has greater access to the type of national "empirical data" that neither party presented. *Kimbrough v. United States*, 552 U.S. 85, 109 (2007) (citation omitted).

Substantively, Faught argues that the district court gave too much weight to the large-capacity-magazine enhancement when choosing his 63-month sentence. Yet the court's bottom-of-the-guidelines sentence warrants a presumption of reasonableness on appeal, and we may overturn this sentence only if it amounted to an abuse of discretion. *See Lynde*, 926 F.3d at 279. It does not. When imposing the sentence, the court analyzed all of the applicable sentencing factors. On the one hand, the court highlighted that Faught had been convicted of several firearms offenses in recent years, including one incident in which he had shot into a car with a young child. His criminal history increased the need to deter him and to encourage him to respect the law, making any downward variance improper. 18 U.S.C. § 3553(a)(1), (2)(A)–(B). On the other hand,

the court relied on Faught's mental-health struggles to choose a sentence at the bottom of the guidelines range. *Id.* § 3553(a)(1). When balancing the sentencing factors, the court did not even mention Faught's possession of a large-capacity magazine—let alone overemphasize the fact.

We affirm.