*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0290p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED STATES OF AMERICA,

>        *Plaintiff-Appellee,*

        *v.*                                                        No. 05-5549

ALTONIO PAULETTE,

>        *Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 03-20091—Bernice B. Donald, District Judge.

Argued: April 21, 2006

Decided and Filed: August 10, 2006

Before: GIBBONS and COOK, Circuit Judges; SCHWARZER, Senior District Judge.[*]

_____

## COUNSEL

**ARGUED:** Marty B. McAfee, MCAFEE & MCAFEE, Memphis, Tennessee, for Appellant. Camille R. McMullen, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee. **ON BRIEF:** Marty B. McAfee, MCAFEE & MCAFEE, Memphis, Tennessee, for Appellant. Camille R. McMullen, ASSISTANT UNITED STATES ATTORNEY, Memphis, Tennessee, for Appellee.

_____

## OPINION

_____

        WILLIAM W SCHWARZER, Senior District Judge. Defendant-appellant Altonio Paulette, having been convicted of being a felon in possession of a firearm, appeals his conviction and sentence. 18 U.S.C. § 922(g). Paulette contends (I) that the denial of his motion to suppress evidence was error; (II) that the evidence was insufficient to support his conviction for possession of a firearm; (III) that the district court erred in its Guidelines calculation by applying a two-level enhancement for obstruction of justice; and (IV) that the court's denial of a reduction for acceptance of responsibility was error. For the reasons that follow, we vacate Paulette's sentence to the extent it rests on the obstruction of justice enhancement and remand for resentencing. In all other respects, we affirm.

_____

[*] The Honorable William W Schwarzer, Senior United States District Judge for the Northern District of California, sitting by designation.

## FACTS AND PROCEDURAL HISTORY

On November 1, 2002, two Memphis police officers observed Paulette and another individual engage in a hand-to-hand transaction. The officers, based on their knowledge of the area and experience with drug crimes, believed the transaction to be related to drugs. When Paulette noticed the officers approaching in their marked squad car, he quickly moved his hand to his pocket and began to walk away from the officers. The officers pursued Paulette and eventually detained him. Believing that Paulette had a weapon, they conducted a pat down search and discovered two plastic bags of marijuana on his person. The officers examined Paulette's driver's license, which listed his address as the Memphis-suburb Cordova. When asked by the officers what he was doing in Memphis, Paulette stated that he was currently staying with his aunt nearby. One of the officers later testified that he suspected Paulette was dealing drugs out of the home of a female relative, a practice he considered to be common in the area.

The officers accompanied Paulette to his aunt's home. His aunt answered the door and gave the officers permission to search her residence. She directed the officers to the room where Paulette "generally slept," in which they discovered more drugs, firearm ammunition, and a loaded 9 mm assault rifle. The officers found the drugs and ammunition in drawers exclusively used by Paulette and the firearm under one of the beds in the room. Paulette's aunt testified that he was the only person living in the room at the time and that she had not seen the firearm under the bed when cleaning the room roughly a month before the search.

The officers confronted Paulette with the evidence. Specifically, they questioned Paulette as to why the room contained ammunition for a .40 caliber weapon but not the weapon itself. Paulette volunteered that he had sold the .40 caliber weapon and purchased the assault weapon found by the officers. Overhearing the officers discussing whether to question his aunt about the marijuana found in the house, Paulette also volunteered that "she [Paulette's aunt] did not know anything about it. It's mine."

Paulette was indicted on two counts of drug possession with intent to distribute, 21 U.S.C. § 841(a)(1), and three counts of being a felon in possession of a firearm, 18 U.S.C. § 922(g). Paulette moved to suppress the evidence obtained in the officers' search of his person and his aunt's house and his statements upon being confronted with the evidence. Following an evidentiary hearing, a magistrate judge recommended that the motion be denied except with respect to Paulette's statement that he was currently staying at his Aunt's house. The district court adopted the magistrate judge's recommendations.

On the day the district court impaneled a jury, Paulette pleaded guilty to both drug counts, but maintained his not guilty plea to the three weapons counts. At trial, Paulette stipulated to the prior felony conviction and admitted that he was working as a drug dealer at the time of his arrest and that the drugs found in his aunt's house belonged to him. Paulette also testified that he lived with his mother at the time of his arrest but also spent nights at his aunt's house. The following exchange occurred at the start of his direct examination:

Q. [Defense Counsel] Where do you live?
A. [Paulette] Currently I stay at 201 Poplar, but I've been a resident of Memphis all my life.
Q. Before you were arrested where did you live when you were out in the community?
A. Recently – well, at the same time I stayed with mother in Cordova, but I could spend the night over at my aunt's house when I was out there in the area.
. . . .
Q. And how long would you say that you had been staying at her house?

A.  I would say about a month.
Q.  Okay.  Did you stay there every single night?
A.  No, sir.
Q.  Were you paying rent to stay there?
A.  No, sir, but if she asked me for anything, I would give it to her.
Q.  Okay.  She took you in when you needed a place to stay?
A.  Yes, sir.

On cross-examination, Paulette added the following:

Q.  [Prosecution]  Mr. Paulette, you indicated that you, prior to this incident and you being incarcerated pursuant to this arrest, you're a life-long Memphian, correct?
A.  Yes, ma'am.
Q.  And you – you gave some sort of double answer, you said at the time of this arrest on November 1st of 2002 you lived with your mother in Cordova?
A.  Ma'am, I could go to either residence.  It was like I could go to my sister's residence, also.  So I could pretty much spend the night either – either where I was in the area.
. . . .
Q.  Okay.  And just so I'm clear, you're saying that you could have stayed with your mother, right?
A.  If I was in the area.
Q.  And you could have stayed with your sister?
A.  If I was in her area.
Q.  Okay.  And because you were in your aunt's area, you're telling this jury that's the only reason you were staying with her?
A.  Not exactly.
Q.  Okay.  You didn't really have any other place to go, correct?
A.  No, no, ma'am.
Q.  I'm sorry?
A.  I could go to my sister's house or my mother's house, but since I didn't have transportation and this [Memphis] was where I did my business, that's where I was most of the time, that's where I chose to be.  But I could go to any residence that I have and spend the night there and it won't be a problem.

When the trial resumed the next day, the government resumed the cross-examination:

Q.  Mr. Paulette, on yesterday we discussed where you stayed or we – we discussed that at the top of your cross-examination, correct?
A.  Yes, ma'am.
Q.  And you were permitted to make jail phone calls while incarcerated, correct?
A.  Yes, ma'am.
[. . .]
Q.  And you spoke to your mother regarding where you stayed, correct?
A.  Yes, ma'am.
Q.  And on yesterday you told members of the jury that you had many places to stay, including your mother's house in Cordova, correct?
A.  Right.
Q.  And your sister's house, correct?
A.  Yes, ma'am.
Q.  As well as Tammy's [Paulette's aunt] house, correct?
A.  Yes, ma'am.

Q.  And you indicated that it just depended on what area of the neighborhood that you were in, correct?
A.  Yes, ma'am.

The government then sought to impeach his prior testimony about his residence at the time of the crime by playing a tape of Paulette's jail house telephone conversation with his mother. The cross-examination continued after the playing of the tape:

Q.  Mr. Paulette, in that conversation you clearly indicated that you had nowhere else to go [but to his aunt's house], correct?
A.  I had somewhere else to go, I just preferred not to go to my mother's house, that's way [sic] I said in that way, I could have but I chose not to.
Q.  That's not what you told the member's of the jury yesterday, right?
A.  I could go to her house, I chose not to go to her house, just like I said on that phone call that she had, which her boyfriend, which is now her husband there, and me and him don't get along, so that's why I chose not to go there.  I am welcome in my mother's house just as well at my sister's house, but I don't have transportation. So I wasn't free to go places that I would have went to if I did have transportation, I had a key to my sister's house at the time.

The jury returned a guilty verdict on all three firearms counts.  At sentencing, the government sought a two-level enhancement based on what it characterized as Paulette's perjury regarding his residence at the time of the crime.  Paulette objected to the enhancement.  The district court imposed the enhancement, stating:

In this case I do recall that conversation and it appears to me that the defendant persisted in a certain statement regarding his address and did that with a view of trying to persuade the finder of fact to a particular position or finding. The government gave him an opportunity on a couple of occasions to correct the statement and he persisted, they then brought in the tapes and brought in the defendant's mother as I said before, the mother said and did in fact impeach him.

Because of what the defendant was attempting to do in that statement that made it a material statement and the court finds that based on that he was impeached, it was clearly from the evidence a false statement, and so I find under 3C1.1 that the enhancement is appropriate and I will deny the defendant's objection.

The district court made no further findings.  It also denied Paulette's request for a two-level reduction for acceptance of responsibility under USSG § 3E1.1, reasoning that his late guilty plea did not save the government the expense of trial preparation and was only to the drug counts. The court calculated an offense level of twenty-six and a criminal history category of VI, resulting in a Guidelines range of 120 to 150 months' imprisonment.  Taking into account the sentencing factors in 18 U.S.C. § 3553(a), the district court sentenced Paulette to 120 months' imprisonment, the bottom of the Guidelines range and statutory maximum.

## DISCUSSION

## I.        DENIAL OF MOTION TO SUPPRESS

Paulette contends that all evidence and statements obtained during his encounter with the officers should be suppressed because the facts did not support a reasonable suspicion of criminal activity.  We review the denial of a motion to suppress under a dual standard.  *United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003).  Legal conclusions are reviewed de novo. *Id*. Factual findings are reviewed for "clear error" and are only set aside when the reviewing court "is left with the definite and firm conviction that a mistake has been committed."  *Ellis v. Diffie*,

177 F.3d 503, 505 (6th Cir. 1999) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). "[W]e must consider the evidence in the light most favorable to the government." *Rodriguez-Suazo*, 364 F.3d at 643.

The Fourth Amendment permits an officer to make a brief investigatory stop of an individual if the officer bases his action on a "reasonable suspicion" that criminal activity may be occurring. *United States v. Arvizu*, 534 U.S. 266, 273 (2002); *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968). Courts must look "at the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 417-18 (1981)). The court "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them." *Arvizu*, 534 U.S. at 273.

The district court did not err in denying Paulette's motion to suppress. Viewing the totality of the circumstances, the officers had a reasonable suspicion that Paulette was engaged in criminal activity based upon his hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area. *See Illinois v. Wardlow*, 528 U.S. 119, 124 (2000). The officers were also justified in searching Paulette for their own protection, given the frequency with which drug dealers arm themselves, Paulette's insistent movements towards his right pocket, and his presence in a high crime neighborhood. *See Terry*, 392 U.S. at 23-24. Paulette does not challenge the officers' actions beyond the initial stop nor the admission of his voluntary statements regarding the drugs and the firearm found in his aunt's home.

## II.       SUFFICIENCY OF THE EVIDENCE

Paulette contends that the evidence was insufficient to support his conviction for possession of a firearm. Specifically, he argues that the government failed to demonstrate that he had actual or constructive possession of the gun and ammunition found in his aunt's home. We review the evidence "in the light most favorable to the prosecution," *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), and must "draw all available inferences and resolve all issues of credibility in favor of the jury's verdict," *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998).

Paulette's argument lacks merit. When confronted with the .40 caliber ammunition and a 9 mm assault rifle, he admitted to the officers "that he sold the [.40 caliber] gun that went with the ammunition and that he bought that assault rifle to replace it for protection." Additionally, Paulette did not challenge his aunt's statement that, at the time of arrest, he was the sole occupant of the room where the firearm was hidden. Although Paulette at trial denied that he made a statement regarding his possession of the weapon, the jury could accept the officer's testimony regarding the conversation, rather than Paulette's version. Resolving the credibility dispute in favor of the jury's verdict, the evidence presented at trial was sufficient for a rational fact-finder to infer that Paulette possessed a firearm.

## III.       THE OBSTRUCTION OF JUSTICE ENHANCEMENT

Paulette contends that the district court erred in imposing an obstruction of justice enhancement based on his testimony at trial regarding where he lived at the time of his arrest. Specifically, Paulette argues that the district court enhanced his sentence on the basis of facts not admitted to nor proven to a jury, relied on false evidence or misinformation in finding that Paulette made false statements, and erred as a matter of law in applying § 3C1.1 of the U.S. Sentencing Guidelines.

Paulette's first two arguments are without merit. The district court could properly impose a sentence within the statutory range based on judicially-found facts. *See United States v. Booker*, 543 U.S. 220, 233 (2005); *United States v. Williams*, 411 F.3d 675, 678 (6th Cir. 2005). Moreover,

the district court did not base its perjury finding on false evidence or misinformation. The district court stated that the government "brought in the tapes and brought in the defendant's mother" to impeach Paulette. Although this was a less than precise description of the evidence at trial, Paulette has not demonstrated a resulting due process violation.

Paulette's third argument is a different matter. The district court enhanced Paulette's sentence by two levels under § 3C1.1 for having made a false statement at trial. *See* § 3C1.1 cmt. n.4(b) (2004) (listing conduct to which the enhancement applies, including "committing, suborning, or attempting to suborn perjury"). Paulette objected to the enhancement at sentencing. In *United States v. Dunnigan*, 507 U.S. 87, 95 (1993), the Supreme Court held that if a defendant objects to an enhancement resulting from his testimony, the district court must make independent findings with respect to each element of perjury, or at least make a finding that "encompasses all of the factual predicates for a finding of perjury."[1] Such findings are required to ensure that a defendant who is found guilty is not penalized by an enhancement under § 3C1.1 for having testified on his own behalf. *See United States v. McRae*, 156 F.3d 708, 712 (6th Cir. 1998).

No such findings were made by the district court. We have consistently and repeatedly vacated sentences imposing an obstruction of justice enhancement for failure to comply with the *Dunnigan* mandate. *United States v. Lawrence*, 308 F.3d 623, 632-33 (6th Cir. 2002); *McRae*, 156 F.3d at 712; *United States v. Sassanelli*, 118 F.3d 495, 500-02 (6th Cir. 1997); *United States v. Spears*, 49 F.3d 1136, 1143-44 (6th Cir. 1995); *Mathews v. United States*, 11 F.3d 583, 586-87 (6th Cir. 1993); *United States v. Medina*, 992 F.2d 573, 591 (6th Cir. 1993).

Moreover, as noted in *Sassanelli*, "[o]ur court has since added its own gloss to *Dunnigan.*" 118 F.3d at 501. To fulfill the Supreme Court mandate and to provide the appellate court with a meaningful record to determine that such an independent finding has been made, we have spelled out our own requirements:

> For a district court to enhance a defendant's sentence under § 3C1.1, the court must: 1) identify those particular portions of defendant's testimony that it considers to be perjurious; and 2) either make a specific finding for each element of perjury or, at least, make a finding that encompasses all of the factual predicates for a finding of perjury.

*Lawrence*, 308 F.3d at 632. None of those requirements were complied with by the district court. Accordingly, we must vacate the sentence and remand for further proceedings.[2]

## IV.    DENIAL OF ACCEPTANCE OF RESPONSIBILITY REDUCTION

Finally, Paulette contends that the district court erred in denying him a two-level reduction in his offense level for acceptance of responsibility. *See* USSG § 3E1.1. We review the determination of whether a defendant has accepted responsibility for clear error. *United States v. Roberts*, 243 F.3d 235, 240-41 (6th Cir. 2001). The defendant bears the burden of showing that he has accepted responsibility. *Id.* at 241 (citing *United States v. Williams*, 940 F.2d 176, 181 (6th Cir.

---

[1] "A witness testifying under oath or affirmation [commits perjury] if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.

[2] Although our cases involving errors in the imposition of an obstruction of justice enhancement have not engaged in harmless error analysis, it is noteworthy that the two-level enhancement shifted the sentencing range from 100-125 months to 120-150 months.

1991)).  Paulette has failed to meet his burden.  The Guidelines note that the § 3E1.1 adjustment "is not intended to apply to a defendant who puts the government to its burden of proof at trial."  USSG § 3E1.1 cmt. n.2.  Paulette, by pleading guilty to only two of five counts and doing so only after a jury had been impaneled, still placed a significant burden on the government.  The district court did not clearly err in finding that the government had to prepare for trial on all five counts, making a reduction under § 3E1.1 inappropriate.

## CONCLUSION

For the preceding reasons, we **VACATE** Paulette's sentence and **REMAND** this matter for resentencing consistent with this opinion.  In all other respects, we **AFFIRM**.