NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0303n.06

No. 23-1570

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

Jul 16, 2024
KELLY L. STEPHENS, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff-Appellee, | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE EASTERN DISTRICT OF MICHIGAN |
| RAY GUERRERO, | ) ) | |
| Defendant-Appellant. | ) ) ) | OPINION |

Before: MOORE, COLE, and MATHIS, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** After a multi-day trial, a jury convicted Ray Guerrero for his part in a drug-trafficking conspiracy and for being a felon in possession of firearms. Guerrero does not challenge his convictions on appeal but instead attacks nearly every finding that the district court made en route to sentencing him to 292 months' imprisonment. The bulk of Guerrero's arguments fail because the district court was within its authority to rely on certain facts proven at trial. But the district court nonetheless failed to explain adequately the basis for Guerrero's sentence and to acknowledge a key argument Guerrero made for a lower sentence. Accordingly, we AFFIRM in part, REVERSE in part, VACATE Guerrero's sentence, and REMAND this case for resentencing consistent with this opinion.

## I. BACKGROUND

We recount only the facts relevant to Guerrero's appeal focused on issues at sentencing.

### A. Pre-Trial Proceedings and Trial

After substantial pre-trial proceedings that are not relevant to this appeal, on September 29, 2022, Ray Guerrero was indicted by a grand jury on three counts contained in an amended second superseding indictment: (1) conspiracy to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. §§ 846 and 841(a)(1); (2) felon in possession of firearms and ammunition, in violation of 18 U.S.C. § 922(g)(1); and (3) possession of a firearm in furtherance of a drug-trafficking crime, in violation of 18 U.S.C. § 924(c). R. 587 (Am. Second Superseding Indictment at 1–5) (Page ID #2452–56). Guerrero pleaded not guilty to all three counts and proceeded to a jury trial which began on October 12, 2022. R. 611 (PSR ¶¶ 17–18).

Over the course of Guerrero's trial, which lasted from October 12 to October 21, the government called fifteen witnesses. Appellant Br. at 4. We focus on the testimony of the witnesses relevant to Guerrero's appeal. Jerimy Wolosonowich testified to being a customer of Guerrero's over the course of many years. R. 606 (Trial Tr. at 78:19–23, 79:20–80:18, 81:8–11) (Wolosonowich Direct) (Page ID #2710–13). Wolosonowich began buying cocaine from Guerrero in 2009 through an intermediary: Wolosonowich's friend Kenny. *Id.* After purchasing cocaine from Guerrero about five times through Kenny, *id.* at 81:21–25 (Page ID #2713), Wolosonowich began reaching out to and purchasing cocaine from Guerrero directly, *id.* at 82:1– 22 (Page ID #2714). Wolosonowich bought twenty dollars' worth of cocaine directly from Guerrero approximately fifteen times. *Id.*

Wolosonowich bought other drugs from Guerrero, too, including Vicodin. *Id.* at 88:23–89:5 (Page ID #2720–21). When Guerrero was not available to sell to Wolosonowich, Guerrero sometimes directed Wolosonowich to his son, Oscar. *Id.* This happened approximately five times beginning in 2015. *Id.* at 89:9–14 (Page ID #2721). Wolosonowich explained that in July 2016 Oscar was around eighteen years old, so that Oscar would have been seventeen years old when Wolosonowich first bought Vicodin from Oscar. *Id.* at 93:23–94:11 (Page ID #2725–26).

Kendrick Johnson, a cooperating witness, also testified about Guerrero's drug dealing. Johnson began purchasing cocaine from Rolando Guerrero, one of Ray Guerrero's brothers, in 2013. R. 606 (Trial Tr. at 127:18–128:8) (Johnson Direct) (Page ID #2759–60). Johnson initially bought relatively small quantities of cocaine from Rolando, about one sixteenth of an ounce per purchase, for five to six months. *Id.* at 129:7–20 (Page ID #2761). This soon changed, however, when Johnson's friend, Lee Shelby, got involved. Johnson connected Shelby with Rolando, and Shelby began purchasing cocaine by the ounce from Rolando. *Id.* at 130:7–133:6 (Page ID 2762–65).

During the first transaction involving both Johnson and Shelby and Rolando Guerrero, Rolando explained to Johnson and Shelby that Rolando needed to obtain these larger amounts of cocaine from Ray Guerrero. *Id.* After Shelby and Johnson initially contacted Rolando, Rolando called Johnson and Shelby back approximately ten to fifteen minutes later and told them that they could head to a home on Virginia Street in Pontiac, Michigan, because Ray Guerrero was en route with the cocaine. *Id.* This same interaction—calling Rolando, who then explained that he needed to reach out to Ray—happened more than ten times. *Id.* Each time, Johnson and Shelby would wait fifteen to thirty minutes at the Virginia Street residence until Ray Guerrero showed up. *Id.*

Johnson directly saw Ray Guerrero come to the house on these occasions. *Id.* Ray Guerrero waited in his truck with the drugs during these transactions, and Rolando "t[ook] care of business" inside the house. *Id.* at 133:14–134:11 (Page ID #2765–66). On the ten occasions Johnson saw Ray Guerrero pull up to the Virginia Street house, Rolando went to the car to obtain the cocaine from Ray Guerrero. *Id.* at 136:21–137:20 (Page ID #2768–69). The drug deals did not occur until Rolando returned to the house with the cocaine. *Id.*

For the first couple of months of this arrangement, Shelby and Johnson would purchase one to two ounces of cocaine at a time and purchased "about six ounces a week." *Id.* at 134:21–135:23 (Page ID #2767–68). Eventually, Shelby and Johnson began buying more cocaine—sometimes four ounces during a single transaction, and sometimes eight. *Id.* Rolando Guerrero told Shelby and Johnson that he needed to check with Ray Guerrero "[a]ll the time" about whether he had sufficient cocaine. *Id.* at 135:24–136:4 (Page ID #2767–68).

On certain occasions, Shelby and Johnson went to a different residence on Howard Street where Ray Guerrero's brother, Raul, lived. *Id.* at 139:5–9 (Page ID #2771). Shelby and Johnson bought eight ounces of cocaine about six to ten times at the Howard Street residence. *Id.* at 141:9–23 (Page ID #2773). Johnson and Shelby also bought cocaine from a residence on New York Street where Susie Guerrero lived. *Id.* at 142:8–21 (Page ID #2774). This was on Rolando and Ray Guerrero's instruction. *Id.* Shelby and Johson bought cocaine at this residence between twenty and forty times. *Id.* at 142:25–143:19 (Page ID #2774–75). On each of these occasions, Johnson would call Rolando, who then called Ray Guerrero to facilitate the transaction. *Id.* Rolando would call Johnson back to tell him when Ray Guerrero was on his way to the house. *Id.* Johnson and Shelby purchased four to eight ounces of cocaine during these transactions. *Id.* at

4

144:4–145:8 (Page ID #2776–77). These deals transpired in a similar manner to those done at the Virginia Street residence; often, Johnson and Shelby would have to wait twenty to thirty minutes for Ray Guerrero to arrive with the cocaine, and Johnson saw Ray Guerrero arrive at the house on several occasions. *Id.* "So it was mainly just Rolly always preaching that his brother . . . [would] be here within 15 minutes, 20 minutes." *Id.* at 144:22–25 (Page ID #2776).

Johnson explained that Rolando Guerrero reported that Ray Guerrero would go to Texas to pick up more cocaine when the Guerrero family supply was low. *Id.* at 148:15–24 (Page ID #2780). Rolando told Johnson fifty to 100 times that Guerrero was out of state to get more cocaine. *Id.* In the fall of 2015, Johnson and Shelby began acquiring cocaine directly from Ray Guerrero without going through Rolando. *Id.* at 151:9–152:13 (Page ID #2783–84). Johnson testified that he and Shelby bought between one and eight ounces of cocaine up to 150 times from Guerrero. *Id.* at 161:2–10, 161:20–162:7 (Page ID #2793–94).

Lee Shelby testified next. His testimony largely lined up with Johnson's. R. 606 (Trial Tr. at 211:14–23) (Shelby Direct) (Page ID #2843) (testifying to Johnson setting up drug purchases through Rolando Guerrero at the house on Virginia Street); *id.* at 212:1–7 (Page ID #2844) (testifying to deals on Howard and New York Street residences); *id.* at 212:17–213:24 (Page ID #2844–45) (testifying to initially purchasing one ounce of cocaine multiple times per week but then increasing purchases to two to three ounces multiple times per week for period of months); *id.* at 215:8–16 (Page ID #2847) (testifying that when Shelby and Johnson bought drugs through Rolando, Rolando would explain that he obtained the drugs through Ray Guerrero and that they would need to wait until Ray Guerrero had supplied Rolando). Like Johnson, Shelby explained that whenever there were delays in completing a drug transaction at the Virginia Street residence,

Rolando attributed them to Ray Guerrero not having dropped off the drugs. *Id.* at 216:15–217:20 (Page ID #2848–49). Shelby, however, did not see Ray Guerrero drop off drugs at the residence, but that was because Shelby would wait inside the residence. *Id.* at 217:23–218:11 (Page ID #2849–50). With respect to amounts of cocaine, Shelby testified that he bought up to four to eight ounces of cocaine at a time, and estimated that he bought "well over five kilos, probably closer to 10" from the Guerreros over the years. *Id.* at 218:12–25 (Page ID #2850). And with respect to the number of transactions, Shelby estimated that he purchased cocaine from the Guerreros 100 times and had to wait for Ray Guerrero to bring the drugs about twenty-five times. *Id.* at 219:4–13 (Page ID #2851).

On certain occasions, Shelby directly spoke with Ray Guerrero about transactions. In October 2015, Shelby arranged a controlled buy of two ounces of cocaine through a phone call with Ray Guerrero. *Id.* at 225:5–7, 227:3–17, 228:11–24 (Page ID #2857, 2859, 2860). In July 2016, Shelby arranged another controlled buy with Rolando. *Id.* at 232:6–11 (Page ID #2864). Rolando reported, however, that this load of cocaine was intercepted in Oklahoma. *Id.* at 232:17–24 (Page ID #2864). Ray Guerrero told Rolando that more drugs were coming despite the issue. *Id.* at 234:7–24 (Page ID #2866).

The final relevant witness for this appeal was Alvita Lopez. Lopez is the sister of Ray Guerrero's nieces. R. 624 (Trial Tr. at 122:3–7) (Lopez Direct) (Page ID #3396). Lopez spent her summers in 2015 and 2016 at the Virginia Street residence when she was between twelve and thirteen years old. *Id.* at 123:9–22 (Page ID #3397). Lopez witnessed Rolando Guerrero sell cocaine, marijuana, and various pills from the Virginia Street residence "thousands" of times. *Id.* at 124:3–15 (Page ID #3398). Both Rolando and Rosie Guerrero, one of Lopez's sisters, told

6

Lopez that the drugs came from Ray Guerrero. *Id.* at 125:18–20 (Page ID #3399). When Rolando needed more supply, he would get it from Ray Guerrero on a weekly basis. *Id.* at 127:17–24 (Page ID #3401). Lopez testified that Ray Guerrero would arrive in a white pickup truck to resupply the drugs. *Id.* at 129:20–130:3 (Page ID #3403–04). And she saw Ray Guerrero deliver drugs in this manner five or ten times. *Id.* at 130:4–7 (Page ID #3404); *but see id.* at 136:15–19 (Page ID #3410) (testifying that she saw Ray Guerrero bring drugs over fifty times during the two summers).

Certain details of the witnesses' testimony aside from testimony regarding Ray Guerrero's drug dealing are also relevant. Johnson initially lied to law-enforcement officers about his buying drugs from the Guerreros. *See, e.g.*, R. 606 (Trial Tr. at 174:22–175:11) (Johnson Cross) (Page ID #2806–07); *id.* at 179:4–18 (Page ID #2811) (admitting to lying to officers about time period during which he facilitated drug transactions between Shelby and Guerreros). For his cooperation, Shelby received a plea deal through which he pleaded guilty to illegal use of a phone, a charge with a substantially lower maximum sentence than various drug crimes. R. 606 (Trial Tr. at 238:15–21) (Shelby Direct) (Page ID #2870). Shelby made the decision to cooperate after he was stopped by police officers in August 2015 when he had nine ounces of cocaine in his car. R. 606 (Trial Tr. at 250:3–7) (Shelby Cross) (Page ID #2882). Shelby told agents that he bought the nine ounces of cocaine from a drug dealer named D Real. *Id.* at 253:4–18 (Page ID #2885). When he began cooperating, Shelby admitted to lying initially to agents. *Id.* at 254:6–7 (Page ID #2886). And he admitted that he told the agents that he had purchased three kilograms of cocaine from Rolando, not ten, during an initial proffer. *Id.* at 260:21–261:15 (Page ID #2892–93). Finally, Lopez admitted on cross examination that she had never spoken with Ray Guerrero. R. 624 (Trial Tr. at 146:9–12) (Lopez Cross) (Page ID #3420).

On October 21, 2022, the jury convicted Guerrero on counts one and two of the indictment—conspiracy to possess with intent to distribute and to distribute controlled substances and felon in possession of firearms and ammunition—and acquitted him on count three—possession of a firearm in furtherance of a drug-trafficking crime. R. 600 (Verdict at 1–3) (Page ID #2536–38). With respect to count one, the jury found that Guerrero was responsible for possessing "at least 500 grams" of cocaine. *Id.* at 2 (Page ID #2537). The jury found that amount as opposed to "at least five kilograms" or "less than 500 grams." *Id.*

## B. Guerrero's Sentencing

Prior to sentencing, the probation office filed a pre-sentence report. R. 611 (PSR). The PSR recommended a total offense level under the sentencing guidelines of 42. *Id.* ¶ 53. The PSR concluded that, under the guidelines, at least five kilograms but less than fifteen kilograms of cocaine were attributable to Guerrero, leading to a base offense level of 30. *Id.* ¶ 42. And the PSR found five sentencing enhancements applicable: possession of a dangerous weapon; making of a credible threat to use violence or directing the use of violence; maintaining a drug premises; involving a minor in distribution of a controlled substance; and being an organizer or leader. *Id.* ¶¶ 43–48. The PSR recommended no downward adjustments for acceptance of responsibility. *Id.* ¶ 52. Pursuant to the jury's findings with respect to the amount of cocaine, Guerrero's statutory minimum term of imprisonment was five years and statutory maximum was forty years. *Id.* ¶ 103; 21 U.S.C. § 841(a)(1), 841(b)(1)(B). Under the guidelines, Guerrero's suggested total offense level and criminal-history category of III yielded a guidelines range of 360 months to life imprisonment. *Id.* ¶ 104. Taking account of the relevant statutory maximum, however, the range was 360 to 480 months. *Id.*

8

The district court held Guerrero's sentencing hearing on June 14, 2023. R. 622 (Sent'g Tr.) (Page ID #3203–67). Guerrero's counsel first argued against holding Guerrero responsible for at least five kilograms of cocaine because the jury found only that he possessed 500 grams or more beyond a reasonable doubt. *Id.* at 9:4–21, 11:17–12:5 (Page ID #3211, 3213–14). Counsel concurrently contended that even if the court considered acquitted conduct, the jury's verdict reflected a more accurate estimate of attributable drug quantity. *Id.* at 13:19–14:17 (Page ID #3215–16). The government argued that five kilograms was an accurate drug quantity. *Id.* at 15:4–19:6 (Page ID #3217–21). The district court adopted the government's position as reflected in the PSR and found five kilograms by a preponderance of the evidence. *Id.* at 19:7–15 (Page ID #3221).

After rejecting the application of two different enhancements, the district judge then found that a preponderance of the evidence supported applying the enhancement for involving a minor in the crime, based on the testimony at trial concerning Guerrero's son, Oscar. *Id.* at 29:25–30:9, 30:21–24, 32:15–20) (Page ID #3231–32, 3234). Following argument, the court then found that Guerrero should be assessed the four-level increase for being a leader or organizer of five or more people. *Id.* at 36:13–17 (Page ID #3238). The district court's final ruling was that Guerrero was not entitled to any decrease in his total offense level for acceptance of responsibility. *Id.* at 38:10–39:3 (Page ID #3240–41). All told, the district court's rulings on drug quantity and applicable enhancements resulted in a guidelines range of 292 to 365 months' imprisonment. *Id.* at 42:24–43:3 (Page ID #3244–45).

The parties then made their closing statements. Guerrero's counsel reiterated that Guerrero should not be held responsible for acquitted conduct, among other arguments. *Id.* at 47:3–48:12

(Page ID #3249–50).  Relevant here, defense counsel also specifically contended that Guerrero should receive a lower sentence to avoid unwarranted disparities with his co-defendants, several of whom, according to Guerrero, engaged in worse or similar conduct.  *Id.* at 54:12–56:1 (Page ID #3256–58).  After Guerrero's allocution, the district court sentenced Guerrero to 292 months' imprisonment.  *Id.* at 60:10–11 (Page ID #3262).  In its colloquy, the court essentially recited certain of the § 3553(a) factors, briefly noted that it thought the guidelines accurately reflected "the heartland of America[n] sentencing," and that a low-end-of-the-guidelines sentence sufficiently accounted for deterrence and the seriousness of the offenses.  *Id.* at 57:8–60:11 (Page ID #3259– 62).  The district court entered its judgment on June 21, 2023, R. 620 (J. at 1–8) (Page ID #3193–3200), and Guerrero timely appealed that same day, R. 616 (Not. of Appeal at 1–2) (Page ID #3167–68).

## II.  DISCUSSION

Guerrero raises a plethora of issues in this appeal.  He argues (1) that the district court's use of acquitted conduct at sentencing—namely, attributing five kilograms of cocaine to Guerrero despite the jury finding only that Guerrero was responsible for 500 grams or more beyond a reasonable doubt—violated Guerrero's Fifth and Sixth Amendment rights, Appellant Br. at 27– 31; (2) that the drug-quantity finding was not supported by a preponderance of the evidence, *id.* at 31–34; (3) that the district court erred in finding that Guerrero's sentence could be enhanced by two levels based on the use of a minor, *id.* at 34–36; (4) that the district court erred by finding the four-level leadership enhancement applicable, *id.* at 36–38; (5) that the district court failed to consider adequately his argument concerning his relative culpability compared to his co-defendants, *id.* at 38–39; and (6) that the district court erred by failing to decrease his total offense

level by two levels for acceptance of responsibility, *id.* at 39–41. Nearly all of Guerrero's arguments are meritless because the record supports the district court's findings that culminated in the applicable guidelines range. But the district court failed to consider adequately Guerrero's arguments concerning his relative culpability as compared to his co-defendants, which resulted in a procedurally unreasonable sentence. We reverse the district court's judgment with respect to that error and remand for resentencing.

## A. Use of Acquitted Conduct

Guerrero's first challenge runs squarely up against our en banc court's precedent: he argues that it was unconstitutional for the district court to find that Guerrero was responsible for five kilograms of cocaine given the jury's findings. Without question, Guerrero raises points that go to the fundamental fairness of criminal proceedings and the propriety of using acquitted conduct at sentencing. Appellant Br. at 27–31. And these arguments echo those of jurists across the federal courts who have called the practice into question. *See, e.g.*, *McClinton v. United States*, 600 U.S. ----, 143 S. Ct. 2400, 2401 (2023) (Sotomayor, J., statement respecting the denial of certiorari) ("As many jurists have noted, the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence raises important questions that go to the fairness and perceived fairness of the criminal justice system." (footnote omitted)); *United States v. White*, 551 F.3d 381, 387 (6th Cir. 2008) (en banc) (Merritt, J., dissenting) ("[P]unishment for acquitted conduct poses unique constitutional problems and must be avoided."). But as Guerrero recognizes, our en banc court has already decisively decided this issue, and we are not at liberty to disregard that precedent absent intervening Supreme Court precedent. *Id.* at 386 (majority op.) (holding that a "district court's consideration of acquitted conduct in sentencing passes constitutional muster"). As the

district court did not sentence Guerrero above the relevant statutory maximum as determined by the facts found by the jury, there is no constitutional error. *See Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000).

Of course, Guerrero has rightly called attention to the Sentencing Commission's proposed amendments to the guidelines, which may prohibit the use of acquitted conduct at sentencing altogether. *Commission Votes Unanimously to Pass Package of Reforms Including Limit on Use of Acquitted Conduct in Sentencing Guidelines*, UNITED STATES SENTENCING COMMISSION (April 17, 2024), https://www.ussc.gov/about/news/press-releases/april-17-2024; Appellant Reply at 1–3. Those amendments would be welcome changes for people like Guerrero, who highlight the unfairness of being sentenced based on facts that a jury presumably rejected. That these amendments may go into effect in November 2024 and could be retroactive, however, does not alter at this time the binding effect on this panel of our en banc court's holding regarding the constitutionality of the practice. Accordingly, Guerrero has failed to identify district-court error on this point.

**B. Drug Quantity**

Even if the district court *could*, as a constitutional matter, find that Guerrero was responsible for more than 500 grams of cocaine, Guerrero argues that it erred by finding that preponderant evidence supported holding Guerrero responsible for five kilograms of cocaine. The record more than supports the district court's findings, so this challenge is without merit.

"The district court's determination of the quantity of drugs for which a defendant is held responsible is a factual finding that we review for clear error." *United States v. Russell*, 595 F.3d 633, 646 (6th Cir. 2010). A district court may estimate drug quantity if the amount for which a

defendant is responsible cannot be known precisely, but "a preponderance of the evidence must support the estimate." *United States v. Jeross*, 521 F.3d 562, 570 (6th Cir. 2008) (quoting *United States v. Walton*, 908 F.2d 1289, 1302 (6th Cir. 1990)). Still, the estimate must "err[] on the side of caution." *United States v. Anderson*, 526 F.3d 319, 326 (6th Cir. 2008). Put differently, "when choosing between a number of plausible estimates of drug quantity, none of which is more likely than not the correct quantity," a court should choose the lower plausible amount. *United States v. Treadway*, 328 F.3d 878, 885 (6th Cir. 2003) (quoting *Walton*, 908 F.2d at 1302).

An estimate must be "supported by competent evidence in the record," *United States v. Owusu*, 199 F.3d 329, 338 (6th Cir. 2000), *abrogated on other grounds by Buford v. United States,* 532 U.S. 59 (2001), meaning that evidence must have "some minimal indicium of reliability beyond mere allegation," *United States v. Silverman*, 976 F.2d 1502, 1504 (6th Cir. 1992) (en banc) (quoting *United States v. Smith*, 887 F.2d 104, 108 (6th Cir. 1989)). Such evidence may be testimonial in nature. *See, e.g.*, *Jeross*, 521 F.3d at 570. Notwithstanding the obligation to underestimate drug quantity when uncertain, "[a] factual finding will only be clearly erroneous when, although there may be evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Oliver*, 397 F.3d 369, 374 (6th Cir. 2005) (quoting *United States v. Navarro–Camacho*, 186 F.3d 701, 705 (6th Cir. 1999)). And when credibility determinations are determinative of factual findings, showing clear error is more difficult. *See, e.g.*, *id.*

Multiple witnesses' consistent and corroborated testimony support the district court's finding that, for sentencing purposes, Guerrero should be held responsible for five kilograms of cocaine. In particular, both Johnson and Shelby testified that Guerrero was the source of cocaine

13

for hundreds of drug transactions over the course of several years and that these transactions ranged in amounts from one ounce to eight ounces. R. 606 (Trial Tr. 134:21–135:23, 141:9–23) (Johnson Direct) (Page ID #2766–68, 2773) (testimony concerning amounts); *id.* at 161:2–10, 161:20–162:7 (Page ID #2793–94) (estimating that Johnson and Shelby bought cocaine from the Guerreros 150 times); R. 606 (Trial Tr. at 212:17–213:24) (Shelby Direct) (Page ID #2844–45) (testimony concerning amounts); *id.* at 218:12–25 (Page ID #2850) (Shelby estimating that he bought between five and ten kilograms of cocaine from the Guerreros); *id.* at 219:4–13 (Page ID #2851) (Shelby approximating that he bought cocaine from the Guerreros one hundred times). Although Ray Guerrero sometimes worked through an intermediary, including through his brother Rolando, and the transactions sometimes took place at different residences, the record indicates that Ray Guerrero was involved as the source of supply at every juncture. *Id.* at 215:8–16 (Page ID #2847) (Rolando explained that he obtained the drugs through Ray Guerrero and that Johnson and Shelby would need to wait until Ray Guerrero had supplied Rolando); *id.* at 216:15–217:20 (Page ID #2848–49) (delays in consummating transactions attributable to Ray Guerrero not having dropped off cocaine); R. 606 (Trial Tr. at 144:4–145:8) (Johson Direct) (Page ID #2776–77) (similar); *id.* at 144:22–25 (Page ID #2776) ("[I]t was mainly just Rolly always preaching that his brother . . . [would] be here within 15 minutes, 20 minutes."). And longer delays occurred when Ray Guerrero had to leave the state to replenish the organization's supply. *Id.* at 148:15–24 (Page ID #2780); R. 606 (Trial Tr. at 234:7–24) (Shelby Direct) (Page ID #2866).

No doubt, Johnson and Shelby are imperfect witnesses. Both witnesses were not initially forthcoming with police officers or agents, *see, e.g.*, R. 606 (Trial Tr. at 174:22–175:11) (Johnson Cross) (Page ID #2806–07); *id.* at 179:4–18 (Page ID #2811); R. 606 (Trial Tr. at 254:6–7) (Shelby

Cross) (Page ID #2886), and both received benefits for cooperating, R. 606 (Trial Tr. at 238:15–21) (Shelby Direct) (Page ID #2870). Moreover, Shelby initially suggested to agents that he had purchased three kilograms of cocaine from the Guerreros. R. 606 (Trial Tr. at 260:21–261:15) (Shelby Cross) (Page ID #2892–93). Still, these issues generally go to the credibility of the witnesses, which the district judge was best positioned to assess. *See, e.g.*, *United States v. Henley*, 360 F.3d 509, 516 (6th Cir. 2004) (district court's reliance on co-conspirator's testimony to estimate drug quantity was not clearly erroneous when fact finder found witness to be credible). And Johnson's and Shelby's consistent statements were largely corroborated by a wholly disinterested witness, Alvita Lopez, who similarly testified to Rolando Guerrero selling drugs, including cocaine, from the Virginia Street residence "thousands" of times over just two summers, and who explained that Ray Guerrero was the source of these drugs. R. 624 (Trial Tr. at 124:3–15, 125:18–20, 127:17–24) (Lopez Direct) (Page ID #3398–99, 3401). *See Henley*, 360 F.3d at 516 (holding that cooperating co-conspirator's testimony was sufficient basis for estimating drug quantity, particularly when the testimony is "consistent with the testimony of other witnesses"). The district court did not clearly err by attributing five kilograms of cocaine to Guerrero.[1]

---

[1]*United States v. McReynolds* does not call for a different result. 69 F.4th 326 (6th Cir. 2023). The first time that case reached this court, we vacated the sentence and remanded only because "the district court did not explain why it found . . . higher drug amounts [than those found by the jury] supported by preponderant evidence." *Id.* at 330 (quoting *United States v. McReynolds*, 964 F.3d 555, 565 (6th Cir. 2020)). In other words, we recognized that the district court *could* find above the amount of drugs found by the jury, but it needed to explain adequately why the record supported doing so. *Id.* When the case returned to this court, we again vacated the sentence because the district court's attribution of the conspiracy-wide drug quantity "was clearly erroneous because the record only present[ed] circumstantial evidence establishing that [the defendant] had knowledge of the conspiracy—it [did] not establish that he was a participant in the conspiracy." *Id.* at 332. Though the conspiracy was involved in the relevant sales here, the district court relied on testimony that directly implicates Ray Guerrero. Accordingly, it was unnecessary to determine whether actions were within the scope of the conspiracy or foreseeable to Guerrero *because they were his own actions*.

**C. Enhancement for Involving a Minor**

We next turn to the district court's application of an enhancement under U.S.S.G. § 2D1.1(b)(16)(B) for knowingly "distribut[ing] a controlled substance to [a person less than 18 years of age] or [for] involv[ing] that individual in the offense." Enhancements must be supported by a preponderance of the evidence. *See, e.g.*, *Jeross*, 521 F.3d at 579. As with many other enhancements, "the standard of review we apply to a district court's application of the Guidelines to the facts 'is somewhat murky.'" *United States v. Pruitt*, 999 F.3d 1017, 1020 (6th Cir. 2021) (quoting *United States v. Abdalla*, 972 F.3d 838, 850 (6th Cir. 2020)). For certain enhancements, like U.S.S.G. § 2D1.1(b)(16)(B), this court has reviewed for clear error a district court's factual findings and the court's application of those facts to the guidelines de novo. *Id.* at 1019–20. At other times and for other enhancements, this court has afforded "significant deference" to the district court's application of the guidelines to the facts when the relevant mixed question is "highly fact-based." *United States v. Histed*, 93 F.4th 948, 959 (6th Cir. 2024) (quoting *United States v. Hazelwood*, 398 F.3d 792, 796 (6th Cir. 2005)), *cert. denied*, No. 23-7327, 2024 WL 2805835 (U.S. June 3, 2024); *see also, e.g.*, *United States v. Merritt*, 102 F.4th 375, --- (6th Cir. 2024) (discussing cases); *United States v. Young*, 553 F.3d 1035, 1052–53 (6th Cir. 2009) ("There is confusion within this circuit concerning the standard of review that should be applied to a district court's decision to impose a leadership enhancement." (collecting cases)); *United States v. Kamper*, 748 F.3d 728, 748 (6th Cir. 2014) (same). For our purposes for both the instant enhancement and the leadership enhancement, "[w]e do not need to resolve [any] conflict" because Guerrero's challenges would fail under any standard. *Histed*, 93 F.4th at 960.

Preponderant evidence supports the application of U.S.S.G. § 2D1.1(b)(16)(B). Wolosonowich clearly testified that when Guerrero's son, Oscar, was first involved in one of the transactions involving Wolsonowich, Oscar was seventeen. R. 606 (Trial Tr. at 93:23–94:11) (Wolsonowich Direct) (Page ID #2725–26). Although Guerrero suggests that Wolsonowich had no factual basis for so concluding, Wolsonowich bought drugs from Oscar on several occasions over a period of years. Moreover, Guerrero entirely failed to contradict Wolsonowich's testimony, whether through rebuttal evidence or cross-examination, seemingly dooming his ability to suggest that it was not more likely than not that Oscar was a minor at the relevant time. *See, e.g.*, *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 329 (2007) (satisfying the preponderance-of-the-evidence standard requires showing only that a fact is "more likely than not" true (emphasis omitted)). Regardless, as the government points out, certain other evidence supports Wolsonowich's testimony, including that Oscar was a teenager when a search warrant was executed at the Coleman Street residence on August 11, 2016. R. 624 (Trial Tr. at 67:21–24, 69:18–20) (Garcia Direct) (Page ID #3341, 3343).

## D. Leadership Enhancement

Guerrero's challenge to the application of the leader-or-organizer enhancement similarly fails. Under the guidelines, a district court may increase a defendant's offense level by four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The commentary to the guidelines directs courts to consider a variety of factors when deciding whether a defendant was a leader or organizer, including "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of

the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4. "A district court need not find each factor in order to warrant an enhancement." *United States v. Nicolescu*, 17 F.4th 706, 725 (6th Cir. 2021) (quoting *United States v. Castilla–Lugo*, 699 F.3d 454, 460 (6th Cir. 2012)). Still, an essential element of the enhancement is that the defendant had "control over co-participants" as opposed to merely control over "property management alone." *See United States v. Christian*, 804 F.3d 819, 824 (6th Cir. 2015). And "[m]erely playing an essential role in the offense is not equivalent to exercising managerial control over other participants" for purposes of the enhancement. *United States v. Vandeberg*, 201 F.3d 805, 811 (6th Cir. 2000).

Guerrero's conduct ticks many of these boxes. As discussed with respect to drug quantity, Guerrero appeared to play a central organizing role in the conspiracy. All cocaine sales essentially went through him, even if executed through an intermediary. And Guerrero was in charge of resupplying the conspiracy with cocaine when supply was low, often traveling out of state to do so. Several of the key properties involved in the drug conspiracy were owned by Guerrero as opposed to other members of the conspiracy. *See* R. 624 (Trial Tr. at 49:19–50:1) (Lighter Direct) (Page ID #3323–24) (Guerrero owned the homes on East Howard, Virginia, and Coleman Streets). Though Guerrero does not appear to contest the "five or more participants" requirement, the record, as recounted above and elsewhere, *see, e.g.*, R. 611 (PSR at 4–5) (cataloguing codefendants and other members of the conspiracy), adequately reflects that numerous co-conspirators were involved and that Guerrero played an outsized role in directing and organizing these members. *See, e.g.*, *United States v. Hernandez*, 182 F.3d 919 (table), 1999 WL 486620, at *7 (6th Cir. 1999)

18

(per curiam) (enhancement applied when defendant "bought drugs, sold drugs, managed the buying and selling of drugs, supervised the importation of drugs . . . , oversaw the smuggling of cash to pay for the imported drugs, and wired money to pay bonds and hire attorneys for couriers arrested throughout the United States"); *United States v. Hagan*, 766 F. App'x 356, 360–61 (6th Cir. 2019) (affirming enhancement when defendant was only person with "connections to the dark web sources of supply and only he determined which drugs to buy, in what quantity, and in what form," among other facts); *United States v. Jackson*, 308 F. App'x 899, 910 (6th Cir. 2009) (similar, when defendant was central source of supply of drugs and defendant set terms of sales). In sum, Guerrero was an organizer or leader of five or more participants or of a conspiracy that was otherwise extensive per the requirements of U.S.S.G. § 3B1.1(a).

### E.  Acceptance of Responsibility

Guerrero's next challenge is to the district court's decision not to decrease the applicable offense level for accepting responsibility. Generally, "[w]e give 'great deference' to a 'district court's decision to deny an acceptance-of-responsibility reduction.'" *Histed*, 93 F.4th at 961 (quoting *United States v. McCloud*, 730 F.3d 600, 605 (6th Cir. 2013)). Under the guidelines, a defendant is entitled to a two-level decrease in their offense level if they "clearly demonstrate[] acceptance of responsibility for [the] offense." U.S.S.G. § 3E1.1(a). As before, the commentary to the guidelines espouses a number of non-exclusive factors to consider when deciding whether a defendant is entitled to this reduction. U.S.S.G. § 3E1.1 cmt. n.1. The commentary explains, however, that "[t]his adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse." U.S.S.G. § 3E1.1 cmt. n.2. Still, a defendant who

goes to trial may nonetheless merit the adjustment in "rare situations," such as when "a defendant goes to trial to assert and preserve issues that do not relate to factual guilt," like raising pure legal or constitutional questions. *Id.* In line with this guidance, "[t]he defendant bears the burden of showing that he has accepted responsibility." *United States v. Paulette*, 457 F.3d 601, 608 (6th Cir. 2006). We will not find error when a district court denies the downward adjustment when the defendant denies their ultimate factual guilt even while "admit[ting] substantial elements of the crimes charged." *United States v. Coss*, 677 F.3d 278, 292 (6th Cir. 2012).

The district court's decision not to reduce Guerrero's offense level for acceptance of responsibility was not error. Contrary to Guerrero's apparent recasting of what transpired at trial, *see, e.g.*, Appellant Br. at 40, Guerrero repeatedly denied his factual guilt for all of the charged counts. Indeed, defense counsel's closing arguments did not call for leniency or raise legal issues, but rather counsel made a wholehearted call for acquittal based on a failure of the government to prove its case. R. 629 (Trial Tr. at 110:6–8) (Def.'s Closing) (Page ID #3915) ("I'm going to start off with a basic premise here, and that is that Ray is not guilty, okay? He is not guilty of the crimes that he's charged with."); *id.* at 114:12–18 (Page ID #3919) (arguing against conspiracy count by contending that Guerrero "bought and sold smaller amounts of drugs" and "[t]he idea that kilos were involved is ludicrous in this case"); *id.* at 133:2–136:13 (Page ID #3938–41) (denying that Guerrero possessed firearms). Simply put, Guerrero challenged nearly every aspect of the government's proof at trial, so it was not error for the district court to deny a downward adjustment for acceptance of responsibility.

**F. Procedural Reasonableness**

Separate from Guerrero's numerous challenges to the calculation of his applicable guidelines range, Guerrero also contends that the district court failed to render a procedurally reasonable sentence. This challenge is of a different ilk: in essence, Guerrero argues that the district court failed to take into account an argument he made concerning his relative culpability as compared to his co-defendants. Appellant Br. at 39–40.

We review the procedural reasonableness of a sentence for an abuse of discretion. *United States v. Gates*, 48 F.4th 463, 469 (6th Cir. 2022), *cert. denied*, 143 S. Ct. 640 (2023).[2] "[I]n reviewing sentences for procedural reasonableness we must ensure that the district court: (1) properly calculated the applicable advisory Guidelines range; (2) considered the other § 3553(a) factors as well as the parties' arguments for a sentence outside the Guidelines range; and (3) adequately articulated its reasoning for imposing the particular sentence chosen, including any rejection of the parties' arguments for an outside-Guidelines sentence and any decision to deviate from the advisory Guidelines range." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007). At issue here is the third requirement: an adequate articulation of the district court's reasoning, including the consideration of Guerrero's mitigating arguments.

We have repeatedly explained that 18 U.S.C. § 3553(a)(6)—"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"—is concerned with national disparities in sentences, not intra-case

---

[2]Guerrero did not raise this procedural-reasonableness objection during sentencing, but the district court did not comply with the procedure detailed in *United States v. Bostic*, 371 F.3d 865, 872–73 (6th Cir. 2004). *See* Appellee Br. at 34–35 (government conceding that the district court failed to ask whether the parties had any objections to the sentence). Accordingly, we review this issue for an abuse of discretion.

disparities. *See, e.g.*, *United States v. Conatser*, 514 F.3d 508, 521 (6th Cir. 2008). But Guerrero's challenge is not that the district court was obligated to fashion a sentence with his co-defendants in mind, but instead that the district court erred by not taking into account his non-frivolous argument for a lower sentence: that co-defendants who engaged in equally culpable (or worse) conduct received lower sentences. Although the district court's decision about whether to reduce a sentence based on co-defendant conduct is left to its discretion, the obligation to address a non-frivolous argument for a lower sentence is not. *See United States v. Wallace*, 597 F.3d 794, 803 (6th Cir. 2010) (explaining that the defendant raised the disparities among co-defendants as a "nonfrivolous argument in seeking a lower sentence," and thus "the record must reflect both that the district judge considered the defendant's argument and that the judge explained the basis for rejecting it" (quoting *United States v. Gapinski*, 561 F.3d 467, 474 (6th Cir. 2009) (alteration adopted))).

Guerrero's counsel raised specific points about the sentences received by Guerrero's co-defendants and why his conduct was at worst as culpable as those co-defendants and possibly less culpable. R. 622 (Sent'g Tr. at 54:12–15) (Page ID #3256) ("[T]he final thing I want to talk about is the disparate sentences."). Counsel directed the district court to the discussion in the PSR concerning the numerous co-defendants and then used those co-defendants' sentences and conduct as a measuring stick against Guerrero's own. *Id.* at 54:15–17 (Page ID #3256). For example, counsel highlighted that Rolando Guerrero received a guidelines range of 210 to 262 months, despite the "despicable things" that Rolando Guerrero did. *Id.* at 54:17–24 (Page ID #3256). He called to attention Rene Guerrero's sentence of 188 months as a fair comparator. *Id.* at 55:6–10 (Page ID #3257). And after noting that many of the co-defendants were already done serving their

sentences, *id.* at 55:11–15 (Page ID #3257), counsel ultimately argued that Guerrero's sentence was an outlier in the case, *id.* at 55:16–19 (Page ID #3257).

The district court did not acknowledge this non-frivolous argument in the slightest. It simply acknowledged that it had read the materials provided to it; that it needed to fashion a sentence that took into account the § 3553(a) factors; and that the poor conditions of confinement during the COVID-19 pandemic called for a low-end-of-the-guidelines sentence. *Id.* at 56:8–59:17 (Page ID #3259–61). Nothing in the record indicates that the district court registered the disparity argument, considered it, or why (or even whether) the district court rejected it. Although a district court need not explicitly acknowledge an argument, the record must nonetheless reflect that the district court understood and considered a defendant's position. *See United States v. Vonner*, 516 F.3d 382, 388 (6th Cir. 2008) (en banc) (district court did not plainly err despite terse colloquy because "[n]othing in the 'record,' or the 'context' of the hearing, suggests that the court did not 'listen[ ]' to, 'consider[ ]' and understand every argument" (quoting *Rita v. United States*, 551 U.S. 338, 358 (2007))). When it is impossible to discern whether the district court fulfilled this basic obligation, however, a sentence is procedurally unreasonable. *Wallace*, 597 F.3d at 803–08 (holding that plain error existed because "[o]n this record, the district judge's failure to properly address this issue is apparent because we are unable to answer the simple question of why the district judge decided to impose a sentence more than twice as long as [a co-defendant]" and "we simply cannot tell whether the district court considered [the defendant's] primary argument for a lesser sentence"); *United States v. Watkins*, 450 F. App'x 511, 516–17 (6th Cir. 2011) (sentence was procedurally unreasonable even under plain-error review because "[t]he court never addressed [the defendant's] contention that his sentence was disproportionate to the one imposed on [a co-

defendant], who committed more than one robbery with [the defendant's] brother but was sentenced to only 80 months in prison"); *cf. United States v. Simmons*, 501 F.3d 620, 624 (6th Cir. 2007) (recognizing that a failure to consider the discretionary ability to vary downwards based on co-defendant disparities when raised could be an "appealable issue"); *United States v. Richards*, 593 F. App'x 500, 504 (6th Cir. 2014) (distinguishing *Wallace* "because the district court . . . explicitly discussed and rejected" the defendant's arguments concerning co-defendant disparities). That was the case here.

The *government's* explanation for why it was appropriate to give Guerrero a higher sentence than his co-defendants does not absolve the district court of *its* responsibility. It may well be true that differences among co-defendants justify different sentences, including their relative culpability and cooperation. Appellee Br. at 36–38. But those reasons are for the district court to articulate, not for the government to point to after the fact. *Wallace*, 597 F.3d at 804 ("facially legitimate reasons" for disparity provided by government does not relieve district court of its responsibility to explain why it thought disparate sentences were appropriate).

Because the district court entirely failed to address and recognize Guerrero's non-frivolous argument for a lower sentence, we must vacate Guerrero's sentence and remand this case for resentencing.[3]

---

[3]As discussed throughout this opinion, the only error in this case is the failure of the district court to consider a non-frivolous argument for a lower sentence. On remand, however, the district court may consider what effect, if any, the amendment to the sentencing guidelines concerning acquitted conduct has on the appropriate guidelines range should that amendment have gone into effect. The district court (and parties) should not, however, revisit the applicability (or not) of any sentencing adjustments.

## III.  CONCLUSION

For the foregoing reasons, we **AFFIRM** in part and **REVERSE** in part the district court's judgment, **VACATE** Guerrero's sentence, and **REMAND** this case to the district court for resentencing consistent with this opinion.